**UNITED STATES of America, Plaintiff,**

v.

**Harvey R. RIDINGER, Defendant.**

**No. 85–00210–01–CR–W–1.**

United States District Court,
W.D. Missouri, W.D.

Nov. 26, 1985.

**1388**

Robert G. Ulrich, U.S. Atty., Robert E. Larsen, Asst. U.S. Atty., Kansas City, Mo., for plaintiff.

Willard B. Bunch, Campbell, Erickson, Morgan & Gibson, P.C., Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, Senior District Judge.

### I.

This case pends on the defendant's October 21, 1985 motion, filed pursuant to 18 U.S.C. § 3145(b), to review an order of detention entered by the Chief Magistrate of this Court on October 7, 1985. This Court's attention was not directed to the motion until it had been pending for some time. On November 15, 1985, however, we obtained a transcript of the combined preliminary examination and detention hearing held before the Chief Magistrate on October 7, 1985 and on November 18, 1985 we conducted a *de novo* review of the detention order entered by the Chief Magistrate. The parties have stipulated the evidence upon which defendant's pending motion should be considered and determined.

We reverse the Chief Magistrate's action in entering the detention order and remand the matter to the Chief Magistrate for further proceedings for the reasons we shall state.

### A.

The government's response concedes that the procedural history of the case was accurately stated in defendant's motion. That history was stated as follows:

(1) On October 3, 1985, a Complaint was issued charging the Defendant, Harvey R. Ridinger, with distributing hydromorphorne, a Schedule II, narcotic controlled substance.

(2) The Defendant was arrested the following day, October 4, 1985, and presented before Chief United States Magistrate, Calvin K. Hamilton, for a first appearance on the Complaint. During the first appearance, the Government moved for a detention hearing pursuant to 18 U.S.C. subsection 3142(f)(2)(A) and (B) and for a continuance of that hearing pursuant to 18 U.S.C. subsection 3142(f). A detention hearing was set for Monday, October 7, 1985.

(3) At the detention hearing, the Government presented the affidavit of Nancie Leigh Howley, Special Agent of the Federal Bureau of Investigation, made October 3, 1985, in support of an Application for Search Warrant for the search of the Defendant's premises at 1601 Marsh, Blue Summit, Missouri; and inventory of items seized from the Defendant's premises at 1601 Marsh, Blue Summit, Missouri, during the execution of a search warrant on October 4, 1985; and inventory of items seized from the person of the Defendant on October 4, 1985 incident to the arrest; and the Government also offered into evidence fifteen color photographs seized from the Defendant's residence during the execution of the above mentioned search warrant. The same were received over objection by Defendant's counsel.

(4) Defendant offered no evidence. It should be noted that Defendant's counsel was advised of the necessity of the Court appearance on the morning of the day of the detention hearing and had no opportunity to confer with Defendant prior to the detention hearing with regard to the introduction of evidence on his behalf.

(5) After taking the photographs briefly under advisement, the Court ruled that no condition or combination of condi-

tions would reasonably assure the safety of any person or the community and ordered the Defendant be committed to the custody of the Attorney General or his authorized representative for detention pending the completion of the trial.

(6) On October 7, 1985, the Court issued its written Order of Detention as required by 18 U.S.C. subsection 3142(i), which is attached as Defendant's Exhibit "1".

A copy of the detention order is attached hereto as Exhibit 1. The detention order reflects that the Chief Magistrate originally made 17 findings of fact to support his conclusion that "no condition or combination of conditions of release will reasonably assure the safety of any other person and the community." The Chief Magistrate, however, set aside the findings made in paragraph 15 and paragraph 17 of his initial findings in a response that he filed to defendant's motion to review on October 22, 1985.

Paragraph 15 of the Chief Magistrate's original findings stated:

15. A house, owned by the defendant, situated at 1601 Marsh, Blue Summit, Missouri, was destroyed by fire, and The Maryland Casualty Insurance Company has refused to pay the $52,000.00 fire insurance claim because the fire has been ruled as arson;

Paragraph 17 of the Chief Magistrate's original findings stated:

17. The undersigned has been provided, *in camera*, with information (which cannot be made public because to do so may jeopardize the life of the source) that the defendant has been involved in the murder of two individuals because they were snitches.

That finding shows on its face that the Chief Magistrate considered information *in camera* that was not disclosed either to government counsel or to the defendant and his counsel. At the *de novo* hearing conducted before this Court, we were advised that neither government counsel, the defendant, nor defendant's counsel had ever seen the information which the Chief Magistrate viewed *in camera* and upon which paragraph 17 of his findings was based. The government neither proffered nor adduced in evidence the undisclosed information at the *de novo* review proceeding conducted before this Court.

### B.

Defendant's October 21, 1985 motion to review made a direct attack on paragraph 17 of the Chief Magistrate's original findings which related to defendant's alleged involvement in two murders. Defendant's motion stated that "[t]his information was not made available to Defendant at the time of the detention hearing and he has had no opportunity to rebut the same" and that "[d]efendant denies that allegation."

Defendant's motion made a like attack in regard to paragraph 15 of the Chief Magistrate's findings relating to whether defendant's residence at 1601 Marsh had been destroyed by a fire that had been ruled as arson, alleging that such a finding was in error. Defendant's motion stated that defendant's counsel was, in fact, representing the defendant in a civil action against the insurer of the property and that an offer to settle that action for $36,270.00 and the extinguishment of a note in the amount of $22,325.42 was pending consideration for acceptance.

In regard to paragraph 13 relating to the "carrying a concealed weapon" charge, defendant's motion to review pointed out that such a charge had been processed as a violation of a city ordinance in the Municipal Court of Kansas City, Missouri rather than as a felony in the Circuit Court of Jackson County, Missouri.[1]

### C.

On October 22, 1985, the day after defendant's motion to review had been filed,

---

1. Defendant's motion further alleged that he had been willing to abide by any conditions of release that may be imposed by the Court including such conditions as were suggested in

the Chief Magistrate filed a response to defendant's motion for review. The Chief Magistrate apparently considered the defendant's motion as a motion for reconsideration of the order of detention entered October 7, 1985.

It is appropriate that we give consideration to the Chief Magistrate's October 22, 1985 response in the course of our *de novo* review. For it is clear that the Chief Magistrate on October 22, 1985, set aside the findings he had made in paragraph 15 in regard to arson and the finding made in paragraph 17 in regard to defendant's alleged involvement in two murders. That response also removes any doubt about the rationale upon which the Chief Magistrate relied to support the detention order entered on October 7, 1985.

### D.

The government filed its response in opposition to defendant's motion to review on October 24, 1985, two days after the Chief Magistrate had filed his October 22, 1985 response to defendant's pending motion. The government's response appropriately noted that the Chief Magistrate's October 22, 1985 response made clear his reliance upon the presumption stated in Section 3142(e).

The government's response, however, recognized that "courts have split as to whether this rebuttable presumption means that the defendant has the burden of introducing evidence contrary to the presumed fact (burden of production) or that the defendant has the burden of convincing the judicial officer that he is not a flight risk or a danger to the community (burden of persuasion).

The government appropriately conceded that "the clear weight of authority has ruled that the presumption only shifts the burden of production (*United States v. Jessup*, 757 F.2d 378, 380–381 (5th Cir. [1st Cir.] 1985); *United States v. Payden*, 598

*United States v. Maull*, 768 F.2d 211 (8th Cir.

F.Supp. 1388, 1397 (S.D.N.Y.1984); *United States v. Freitas*, 602 F.Supp. [1283] 1289, 1292 (N.D.Ca.1985); *United States v. Moore*, 607 F.Supp. 489, 497 (N.D.Ca. 1985))." The government added in a footnote that although the Eighth Circuit had not directly ruled the question, the Eighth Circuit en banc had made clear in *United States v. Orta*, 760 F.2d 887 (8th Cir. en banc 1985), that "it, too, will follow the 'burden of production' approach", citing 760 F.2d at 891 n. 17. We agree.

The government also recognized that under the Eighth Circuit en banc opinion in *United States v. Maull*, 773 F.2d 1479 (8th Cir. en banc 1985) that "the district court reviews the Magistrate's findings *de novo*." The government cited no additional cases in its response. The government, however, argued on the facts that the "detention order detailed a litany of evidence that the defendant is a danger to the community" and that "*[c]oupling this with the rebuttable presumption against release*, the Magistrate had clear and convincing evidence that Harvey R. Ridinger presents a danger to the community and should be detained." (Emphasis ours).

### E.

At the *de novo* review proceeding conducted by this Court, the parties stipulated that the Court should consider all of the evidence adduced before the Chief Magistrate, except the undisclosed information considered by the Chief Magistrate in support of paragraph 17 of his findings which related to defendant's alleged involvement in the murder of two individuals. Counsel for neither side has ever seen that information and therefore the government could not have introduced it in evidence even if it had wanted to do so.

In addition to the evidence before the Chief Magistrate, the parties stipulated that this Court should also consider an affidavit filed by Rory Ridinger, one of the

1985).

defendant's sons, and an affidavit of the defendant which put in issue a number of the findings made by the Chief Magistrate.

Rory Ridinger's affidavit was directed to the Chief Magistrate's finding in paragraph 9 that the defendant has had "very little contact" with any of his four children who reside in the Kansas City area. His son's affidavit states that "I have had a reasonably close relationship with him all of my life and frequent contact with him."[2]

The defendant's affidavit was directed to a number of the Chief Magistrate's findings. In regard to paragraph 12, the 15 Polaroid photographs, the defendant stated that "some of those photographs are not photographs of my anatomy, but of another person" and that the photograph of the male sex organ referred to in paragraph 12 "is not mine." The affidavit also stated that "those photographs were taken during the course of a party and are not indicative of any violence of [sic] threat of violence." The affidavit added "[m]any other photographs were taken from my residence and are in the possession of the government and these photographs, include photographs of Diane Singleton. Those photographs will indicate her condition at the time they were taken. In short, none of these photographs are, in any way, anything other than photographs taken during a party when all participants were inebriated. They certainly should not be considered as any evidence of my, so-called, violent nature."[3]

In regard to that portion of the Chief Magistrate's finding in paragraph 2 relating to the defendant's financial resources, he stated that "any investigation of my financial resources would indicate at the time of my arrest that I am 3 months behind on my property payments" and that "I have no such resources nor have I ever had such resources."

In regard to paragraph 3 of the Chief Magistrate's findings concerning his relationship with the government's paid informant, the defendant stated "evidence can be produced that will indicate that Ms. Singleton was in debt to me for over $2,500.00" and that "[c]ontrary to her statement that the same was [the] result of my drug transactions, in fact it was money I had advanced to make bail bonds for her."

The defendant attached to his affidavit a copy of a contract and application for bail bond dated May 15, 1985 in which he was listed as the indemnitor on a $15,000 bond requiring the appearance of Diane L. Singleton in the District Court of Johnson County, Kansas on June 10, 1985. Ms. Singleton's employment was listed as a receptionist at Metal World, defendant's place of business. Defendant also attached a letter from the bonding company dated November 11, 1985 to defendant's son Rory Ridinger which confirmed a final bond forfeiture payment in the amount of $500 that

---

**2.** His son's affidavit further stated: "If he is permitted to be released on bond, I pledge any assistance that I may provide to him and to the Court with regard to assisting him in complying with conditions. I am willing to have him released into my custody and I am willing to report personally or by telephone on a daily basis as to his whereabouts and any other matters necessary."

**3.** The record establishes that Diane Singleton was the paid government informant. The record does not show where the 15 photographs came from. Indeed, the record suggests that some sort of selection may have been exercised in the presentation of the particular photographs presented to the Chief Magistrate. For the October 4, 1985 inventory made by the FBI included as its Exhibit 15: "8 color, Polaroid photos." Exhibit 16 to the inventory suggests that "misc. color photos were found in a storage cabinet in the kitchen."

All 15 of the color, Polaroid photographs, however, were included in a jacket captioned "8, color, Polaroid photos—kitchen table (plain view)" that was adduced in evidence before the Chief Magistrate, over defendant's objection, as Exhibit H–2.

had been paid by defendant to the bonding company in May, 1985.[4]

In regard to paragraph 17 of the Chief Magistrate's findings concerning the two murders, the defendant stated that "I emphatically deny that I have been involved in any murders of any individuals at anytime for any reason."

## II.

### A.

Counsel for both sides are in agreement that the principles stated by the Eighth Circuit's en banc decision in *Orta* must be applied in this case. They also agree that the Eighth Circuit en banc decision in *Maull*, which presented an entirely different question, did not in any way qualify the principles earlier stated in *Orta*. Indeed, it is clear that *Maull* cited *Orta* with approval.

We do not believe that the Chief Magistrate erred in finding that the defendant was, in fact, armed at the time of his arrest (paragraph 7 of the findings) or in finding that 16 handguns, 7 shotguns, and 11 rifles were seized at the time the search warrant was executed (paragraph 6 of the findings). We are required to find, however, that there is no evidence in this case to support a finding that the defendant ever struck anyone or that any witness had been threatened by the defendant or that any witness had, in fact, expressed any fear of reprisal, as was true in the factual situation presented in *Orta*.[5]

**4.** Defendant's affidavit also attached correspondence from counsel representing the Maryland Casualty Company dated November 11, 1985 which confirmed defendant's counsel's statement in regard to the pending offers to settle the civil action brought on the fire insurance policy.

**5.** In *Orta* the Magistrate found, and the district court did not disagree with his findings, that "Orta had once struck a woman in the head with a revolver, that several weapons and various quantities of cocaine and marijuana had been found in Orta and her husband's places of residence, that Orta had been carrying a loaded

The fact that the paid informant in this case told the FBI agent that "the defendant pointed a gun" at her at the time she made her first buy on August 29, 1985 (paragraph 3 of the findings) does not, standing alone, constitute clear and convincing evidence of dangerousness. For it is clear that in spite of that fact, and in spite of the fact that the paid informant viewed a number of guns on other occasions did not in any way deter the informant from proceeding to make two other buys a few days later on September 4, 1985 (paragraph 4 of the findings) and on September 10, 1985 (paragraph 5 of the findings).

Experience establishes that transactions involving controlled drug substances and guns go hand-in-hand in a very large number of 21 U.S.C.A. § 841(a) cases.[6] If the possession of guns, standing alone, could be said to constitute clear and convincing evidence sufficient to support the entry of a detention order on grounds of dangerousness, a very large number of persons accused of violations of that statute would be subject to pretrial detention as a matter of course.

Such a conclusion is contrary to the legislative history of the 1984 Bail Reform Act, 18 U.S.C. §§ 3141–3150, which states that "there is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of release can reasonably assure the safety of

gun in her purse, and that in both the matter at issue and another incident involving Orta and her husband, witnesses had been threatened or had expressed fears of reprisal." (760 F.2d at 889 n. 7).

**6.** The Eighth Circuit appropriately stated in *Lyons v. Robinson*, 783 F.2d 737 (8th Cir.1985), that: "We have come to recognize that firearms are tools of the trade for drug dealers and are kept by dealers in narcotics almost to the same extent as such dealers keep scales, bags, and cutting equipment. *United States v. McDaniel*, 773 F.2d 242, 247, n. 4 (8th Cir.1985)."

the community or other persons. It is with respect to this limited group of offenders that the courts must be given the power to deny release pending trial." (S.Rep. No. 225, 98th Cong. 1st Sess. 6–7 (1983), *reprinted in* 1984 U.S.Code Cong. & Ad. News 3182, 3189.

The number of defendants that carry and collect guns in connection with their controlled drug substance activity cannot fairly said to be a "limited group of offenders." There cannot, of course, be any question that there is "a small but identifiable group of particularly dangerous defendants" who deal in controlled drug substances. Experience and the adjudicated cases also establish that particular defendants in particular cases have in fact threatened witnesses and, in fact, do pose a threat to the safety of such witnesses and thus constitute a danger to persons in the community.

The factual circumstances in *Delker* presented such a situation. In this case, however, there is no evidence whatsoever that the paid informant felt that she was threatened or that anyone else expressed fear of reprisal or violence so far as the defendant in this case was concerned.

*Orta* made a detailed examination of the legislative history of the Bail Reform Act of 1984. *Orta* stated that:

> Consistent with the intent expressed in the legislative history, the statutory scheme of 18 U.S.C. § 1342 continues to favor release over pretrial detention. Section 3142 provides four alternatives from which the judicial officer must choose: (1) release on personal recognizance or unsecured appearance bond, or (2) release subject to certain conditions, or (3) temporary detention to permit,

among other things, revocation of conditional release, or (4) pretrial detention. (760 F.2d at 890).

After stating that the "judicial officer most often will be deciding between the first and the second alternatives." *Orta* added that:

> The statutorily mandated progression from one choice to the next is critical: *a judicial officer cannot determine that a detention hearing and the possible imposition of pretrial detention is appropriate merely by determining that release on personal recognizance will not "reasonably assure" the defendant's appearance at trial or "will endanger" the community.* The judicial officer must also consider whether one of the codified conditions or any combination of the conditions will "reasonably assure" the defendant's appearance and the safety of the community. *The wide range of restrictions available ensures, as Congress intended, that very few defendants will be subject to pretrial detention.*[7] (760 F.2d at 890–891). (Emphasis added).

### B.

The Chief Magistrate's detention order in this case, contrary to the mandate of *Orta,* merely stated, without any statement of any supporting reasons, that pretrial detention rather than some form of pretrial release was the only alternative that would "reasonably assure the safety of any other person and the community." The detention order does not include "a written statement of the reasons for the detention" as required by Section 3142(i). Rather, the detention order involved in this case merely included a conclusory recitation of the stat-

---

**7.** In other portions of its opinion, the *Orta* court emphasized that "[t]he passage of the pretrial detention provision of the 1984 Act did not, however, signal a congressional intent to incarcerate wholesale the category of accused persons awaiting trial" (760 F.2d at 890); that "[a]lthough the judicial officer may impose further restrictions upon a finding that the legal standard for either the flight or the danger concern is not met, a determination that a defendant's release 'will endanger' the community will be rare" (760 F.2d at 891 n. 14); and that "Congress envisioned the pretrial detention of only a fraction of accused individuals awaiting trial." (760 F.2d at 891).

utory language of the first sentence of Section 3142(f). The detention order obviously failed to identify any "person" whose safety may have been endangered by the defendant's pretrial release. Nor did it state how the safety of the "community" would be protected by the defendant's pretrial detention. Certainly there is no finding, nor any evidence to support a finding, that the defendant would engage in any criminal activity to the detriment of the community if he were released on bail.

■ We find and conclude that the conclusory recitation of the language of the statute does not comply with the mandate of Section 3142(i) which sets forth the requirements of the contents of a detention order. For that section expressly provides that in all detention orders issued pursuant to Section 3142(e), "the judicial officer shall —(1) include written findings of fact *and a written statement of the reasons for the detention.*" (Emphasis added). We believe it is obvious that Section 3142(i) requires that the judicial officer include both (1) findings of fact, and (2) a written statement of the reasons for detention. The fact that a judicial officer may make findings of fact cannot be said to satisfy the additional and separate requirement that he or she state the reasons for detention. The decision of whether a pretrial detention order should be entered must necessarily be decided on a case-by-case basis. The mere recitation of the conclusory statutory language of Section 3142(f) does not comply with the mandate of Section 3142(i). The legislative history of the 1984 Act, which we discuss in subpart C of this part of our memorandum opinion, fully supports the construction we have given Section 3142(f) and (i).

### C.

The legislative history of the 1984 Act contained in Report of the Senate Committee on the Judiciary, S.Rep. No. 98–225, 98th Cong., 2nd Sess. (1984 U.S.Code Cong.

& Ad.News, p. 3182–3219), is as vague in regard to the type of detention hearing that must be conducted as it is in regard to the scope of the district court's review of a detention order entered by a magistrate. There are, however, some comments in that legislative history that may be said to throw some light on what the Congress may have had in mind in regard to the type of hearing that should be conducted before a pretrial detention order is entered.

The Report generally states that:

The concept of defendant dangerousness is described throughout this chapter by the term "safety of any other person or the community." The reference to safety of any other person is intended to cover the situation *in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern,* while the language referring to the safety of the community *refers to the danger that the defendant might engage in criminal activity to the detriment of the community.* (Emphasis added).

(*Id.* at 3195).

The Report states somewhat more specifically that:

Subsections (e) and (f) set forth the findings and procedures that are required for an order of detention. The standard for an order of detention of a defendant prior to trial is contained in subsection (e), which provides that the judicial officer is to order the person detained, if, after a hearing pursuant to subsection (f), he finds that no condition or combination of conditions of release will reasonably assure the appearance of the defendant as required and the safety of any other person and the community. The facts on which the finding of dangerousness is based must, under subsection (f), be supported by clear and convincing evidence.

. . . . .

In determining whether any form of conditional release will reasonably assure

the appearance of the defendant and the safety of other persons and the community, the judicial officer is required to consider the factors set out in section 3142(g). The offense and offender characteristics that will support the required finding for pretrial detention under subsection (e) will vary considerably in each case. Thus the Committee has, for the most part, refrained from specifying what kinds of information are a sufficient basis for the denial of release, and has chosen to leave the resolution of this question to the sound judgment of the courts acting on a case-by-case basis. (*Id.* at 3200–02).

The report certainly makes clear that in the conduct of a case-by-case inquiry the judicial officer may not properly assume that a detention order may be justified solely on a basis of a finding that the defendant is charged with (A) a crime of violence; (B) an offense for which the maximum sentence is life imprisonment or death; (C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act, 21 U.S.C. 801, *et seq.*, as those offenses are set forth in Section 3142(f)(1). For the Report expressly states that: "Because the requirements of subsection (e) must be met before a defendant may be detained, the fact that the defendant is charged with an offense described in subsection (f)(1) (A) through (C) is not, in itself, sufficient to support a detention order." [8] (*Id.* at 3204).

The Report emphasizes the necessity of proof of dangerousness by "clear and convincing evidence" and explains that: "Because of the importance of the interests of the defendant which are implicated in a pretrial detention hearing, the Committee

has specifically provided that the facts on which the judicial officer bases a finding that no form of conditional release is adequate reasonably to assure the safety of any other person and the community, must be supported by clear and convincing evidence. This provision emphasizes the requirement that there be an evidentiary basis for the facts that lead the judicial officer to conclude that a pretrial detention is necessary." (*Id.* at 3205).

### D.

The Report makes no direct reference to how the hearing to obtain the "evidentiary basis for the facts" that may lead the judicial officer, on a case-by-case basis, to conclude that the pretrial detention of a particular defendant is to be conducted. The Report's citation, however, of *United States v. Wind*, 527 F.2d 672 (6th Cir.1975) and *United States v. Gilbert*, 425 F.2d 490 (D.C.Cir.1969), with approval in footnote 17 on page 3190 of the Report and again in footnote 61 on page 3204 of the Report may be said to throw additional light on what the Congress may have had in mind in regard to the type of hearing to be held.

For those cases were cited to reflect the prior case law which has long recognized the appropriateness of the denial of the pretrial release of a particular defendant where it is established that such a defendant would likely obstruct justice, or threaten, injure, or intimidate a prospective juror or witness, or attempt to do so. This Court exercised such power in particular cases before the Congress enacted the 1984 Act.

The provisions of Section 3142(f)(2)(B) expressly codified the prior case law. Because both of those cases cited by the Report dealt specifically with the type of

---

**8.** The Report, of course, adds that: "However, the seriousness of the offenses described in subsection (f)(1) (A) through (C) coupled with the government motion is a sufficient basis *for requiring an inquiry* into whether detention may be necessary to protect the community from the danger that may be posed by a defendant

charged with one of these crimes." (*Id.* at 3204). (Emphasis added). That statement clearly indicates that the type of offense does no more than provide a sufficient basis for conducting an appropriate inquiry into the question of the defendant's dangerousness.

hearing that was required under prior law, it may reasonably be assumed Congress intended that the standards set in those cases were the standards that should be applied in cases under the 1984 Act. We therefore discuss both of the cases that were twice cited with approval in the course of the legislative history of the 1984 Act.

### E.

In *United States v. Gilbert, supra,* 425 F.2d 490, a District of Columbia case, the defendant was arrested and charged with assault with intent to kill. The Bail Agency of the District of Columbia recommended the defendant's release on personal recognizance. The magistrate refused to follow that recommendation on the ground that "appellant was alleged to have threatened to kill the complaining witness and thus had engaged in the obstruction of justice." (425 F.2d at 491). On the bond review in the district court, that court "interrogated counsel for the government with regard to the allegation of threats against the complaining witness." (*Id.* at 491).

Government counsel "represented [to the district court] that friends of appellant had wrongfully entered the apartment of the government's eye-witness and threatened her to make her call the police to disavow appellant's guilt in the shooting incident." (*Id.* at 491). The district court pointed out, however, that "the committing magistrate had found that appellant himself had threatened the complaining witness." (*Id.* at 491).

*Gilbert* then noted that the district court "then, and we think quite properly, ordered that the witness be produced in court the following morning for questions concerning the allegations of threats." (*Id.* at 491). The witness, however, could not appear until the following Monday rather than the next morning as requested by the district court. When defense counsel protested in regard to the short delay, the district court summarily ordered the defendant's pretrial detention.

The *Gilbert* court recognized that "[w]e are satisfied that courts have the inherent power to confine the defendant in order to protect future witnesses at the pretrial stage as well as during trial." (*Id.* at 491–492). It added, however, that:

[T]his power should be exercised with great care and only after a hearing which affords the defendant an ample opportunity to refute the charges that if released he might threaten or cause to be threatened a potential witness or otherwise unlawfully interfere with the criminal prosecution.

(*Id.* at 492).

*Gilbert* reversed and remanded the district court's order for the reason that "[n]o hearing was held by the court to determine whether there was a genuine basis for the allegation of threats by appellant" and because "[t]he allegation of threats against government witnesses should not have been handled in a summary fashion." (*Id.* at 492).

*United States v. Wind, supra,* 527 F.2d 672, as does this case, involved an *in camera* viewing of evidence by the magistrate and by the district court to support their respective findings of dangerousness. The defendant in *Wind* was charged with various narcotic offenses. The magistrate set an interim bond of $1,000,000 pending a hearing at which Wind would be represented by counsel. A hearing was later held before the magistrate. At that hearing, counsel for the government presented evidence to the effect that "Wind had stated that he would post a $1,000,000-bond and then would flee, and that no witness would testify against him." (527 F.2d at 673). Evidence was also presented by the government to the magistrate that "potential witnesses refused to testify against Wind from fear of injury by him." (*Id.* at 673). The magistrate increased the bail to $1,500,000.

In determining whether the defendant's pretrial detention should be affirmed, the

*Wind* court noted that "[a]t the bail review hearing the District Court accepted the United States Attorney's offer to present testimony *in camera* regarding the dangerous propensities of Wind." (*Id.* at 673). The Sixth Circuit noted that the district court had explained that it had done so "in order to protect witnesses from possible retaliation by Wind prior to the trial." (*Id.* at 673).

The *Wind* court further noted in regard to the procedural steps taken in the district court that:

> Wind and his attorney were excluded from the *in camera* hearing. The District Court reviewed the evidence taken before the Magistrate and held that the Magistrate's actions were proper, but it also found as a result of the *in camera* testimony that Wind would flee if released, regardless of bail, and would pose a danger to witnesses and to the community.

(*Id.* at 673).

The *Wind* court recognized that the "transcript of the hearings before the Magistrate contains substantial evidence that Wind did possess these dangerous propensities." (*Id.* at 675). The Sixth Circuit noted, however, that the district court did not rely entirely on the evidence adduced before the magistrate in open court but that it "apparently relied also upon the testimony at the *in camera* hearing from which the defendant and his attorney were excluded." (*Id.* at 676).

Although the record was silent as to the extent to which the district court had relied upon the *in camera* testimony presented to it, the Sixth Circuit reversed and remanded for a new hearing for the reason that:

> In our opinion, reliance on that testimony to any extent was error. No authority was cited to us by the Government which would support resort to the ex parte *in camera* practice in this case, and we have found none. In general, we disapprove of the practice as being inconsist-

ent with the right to a hearing and the opportunity to refute referred to in *Gilbert.*

(*Id.* at 676).

In light of the fact the Chief Magistrate concluded that he was justified in making an *in camera* examination of undisclosed information under the circumstances of this case, it is appropriate that we state the reasons for our disagreement with that view in order that difficulties be avoided in future cases. For it is clear that the number of cases in which the government is seeking pretrial detention orders, particularly in what in the past have been considered routine Section 841(a)(1) narcotics cases, is on the sharp increase in this judicial district.

### F.

Although the Chief Magistrate eventually set aside paragraph 17 of his findings, it is apparent that paragraph 17 was based entirely on his *in camera* review of undisclosed information which suggested that the defendant had been involved in two murders. The Chief Magistrate stated that *United States v. Acevedo-Ramos,* 755 F.2d 203, supported an *in camera* review of undisclosed information which would support his findings of dangerousness. We disagree.

Indeed, we believe that the First Circuit looked the other way when it decided that case. In *Acevedo-Ramos* the Magistrate actually heard the live testimony of an FBI agent. That agent was cross-examined by two defense attorneys on two separate occasions. The Court noted, of course, that defense counsel "were hampered in their efforts to discredit Hill, however, by the government's refusal to allow Hill to name the witnesses whose statements the FBI relied upon or to provide other information that might enable Acevedo to identify them." (*Id.* at 205). The First Circuit also noted that defense counsel did not request that the Magistrate review *in camera* the

FBI agents' investigative file upon which his live testimony was based.

The First Circuit accordingly considered the question of "whether the new Bail Act changes the evidentiary rules and now forbids magistrates to rely upon hearsay evidence in ordering detention." (*Id.* at 207). It concluded that "our reading of the statute and legislative history convinces us that Congress did not intend to forbid the judicial officer to rely upon investigatory descriptions of evidence (and similar hearsay) where the judicial officer reasonably concludes that those descriptions, reports, and similar evidence, in the particular circumstances of the hearing, are reliable." (*Id.* at 207).

The First Circuit also noted that "the magistrate or judge possesses adequate power to reconcile the competing demands of speed and of reliability, by selectively insisting upon the production of the underlying evidence or evidentiary sources where their accuracy is in question." (*Id.* at 207). It supported that observation by a reference to the legislative history of the earlier District of Columbia Bail Act upon which the 1984 Act was patterned, noting that the Report of the House Judiciary Committee had stated in regard to the earlier Act that: "If the court is dissatisfied with the nature of the proffer, it can always, within its discretion, insist on direct testimony." (*Id.* at 208).

The First Circuit accordingly suggested that "[t]hrough sensible exercise of this power of selection, the judicial officer can make meaningful defendant's right to cross-examine without unnecessarily transforming the bail hearing into a full-fledged trial or defendant's discovery expedition.

In fact, even in an unusual case, where the government provides strong special reasons for keeping its evidentiary sources confidential (*e.g.*, protecting witness safety), the magistrate or judge, upon defendant's request, can still test the veracity of the government's testimony and the quality of the underlying evidence, by, for example, listening to tapes or reading documents *in camera*. *Cf. United States v. Stanford*, 551 F.Supp. 209, 210–11 (D.Md.1982) (upholding bail hearing *in camera* inspection requested by *government* over defendant's opposition)." [9] (*Id.* at 207–08).

*Acevedo-Ramos* made two "*Cf.*" citations to *United States v. Stanford*, 551 F.Supp. 209 (D.Md.1982). We believe those citations were significant for purposes of determining the type of hearing required before a detention order may be issued under the 1984 Act. For *Stanford*, we believe properly, recognized the continued applicability of the rationale of both *United States v. Gilbert*, *supra*, and *United States v. Wind*, *supra*, to cases arising under the 1984 Act.

*Stanford* distinguished *Wind* on its facts for the reason that only one of two affidavits were presented for *in camera* review. In regard to the sealed affidavit that was presented for *in camera* review, the *Stanford* court held that:

[W]here, as here, a defendant is provided with a summary of a sealed affidavit, *the reliability of which is determined as a preliminary matter*, and where the summary is found to be accurate and complete in terms of the type of detail necessary to put the defendant on notice as to the nature of the allegations against him, due process is not violated

---

**9.** *Acevedo-Ramos* made clear that: "We do not here mean to suggest that *in camera* presentation of evidence is often desirable or often permissible except in a very unusual case. Rather, we mean simply that in the very unusual case in which strong special reasons warrant confidentiality—and where the defendant is apprised of the gist of the evidence through government testimony at the hearing—the magistrate's inde-

pendent, though *in camera*, review of the underlying evidence at defendant's request offers the defendant greater protection than no independent check at all." (755 F.2d at 209).

Any assumption that the case at bar may be properly considered as "a very unusual case" is untenable. The record establishes that it is quite a run-of-the mill narcotics case.

as long as the defendant has the opportunity to refute the allegations. *See United States v. Gilbert, supra.* The Court is satisfied that the defendant in this case has had ample opportunity to rebut evidence before it. The Court does not believe its holding to be inconsistent with the spirit of *Wind.* (Emphasis added). (551 F.Supp. at 211). We conclude that neither *Acevedo-Ramos* nor *Stanford,* upon which that case relied, support the *in camera* review made by the Chief Magistrate in this case.

### G.

Nor do we believe that the Second Circuit case of *United States v. Leon,* 766 F.2d 77, cited and relied upon by the Chief Magistrate in his response to the defendant's motion, supports the procedures followed by him in this case. *Leon* was decided under the 1984 Act. *Leon* simply concluded under the circumstances of that case that "[h]ere there is ample proof that defendant has threatened two potential witnesses" and that "evidence justifies defendant's detention, *without the aid of the rebuttable presumption Congress included in § 3142(e).* " (766 F.2d at 78). (Emphasis ours).

In regard to how the evidence had been presented the magistrate in *Leon,* the Second Circuit made clear that in addition to other evidence, the magistrate did make an *in camera* review of the testimony of two police officers. The magistrate, however, stated "specifically that he had not relied on testimony of the two police officers given *in camera* regarding certain confidential information that the officers had obtained from informants." (*Id.* at 79–80). Exactly the opposite factual situation was presented in this case. For the Chief Mag-

istrate specifically stated that he did rely upon the undisclosed information to support paragraph 17 of his findings.[10]

It is thus apparent that the two cases relied upon by the Chief Magistrate to support his *in camera* review of undisclosed information do not support the procedures he followed.

### IV.

#### A.

Section 3142(f) imposes the mandatory duty upon the judicial officer to "hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) will reasonably assure the appearance of the person as required and the safety of any other person and the community in a case...." The remainder of Section 3142(f) does not clearly define the type of hearing that the judicial officer is required to conduct. Nor does the legislative history of the 1984 Act, other than the citation of *Gilbert* and *Wind,* deal with that question.

Other portions of Section 3142(f) reflect an apparent adoption of, or perhaps even a codification of procedures that were generally followed prior to the adoption of the 1984 Act. For example, past procedures were apparently codified by that portion of Section 3142(f) which provides that the "rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing."

Still other portions of Section 3142(f), however, clearly suggest that Congress recognized that a defendant should be afforded new and specific procedural protections in order to insure that the power to

---

**10.** In a footnote appended to the statement last quoted in the text, the Second Circuit made clear that "[o]rdinarily, we would remand for a hearing on whether the *in camera* testimony—which the government concedes violated the defendant's right to cross-examine witnesses—tainted the magistrate's conclusion." (*Id.* at 80

n. 3). It concluded under all the circumstances presented in *Léon* that "[a]fter carefully reviewing the sealed transcript of that testimony, we are convinced that nothing of consequence was revealed that was not disclosed also in open court." (*Id.* at 80 n. 3).

order pretrial detention would not be subject to abuse.[11]

Section 3142(f), for example, expressly added a new requirement that "[a]t the hearing, the person has the right to be represented by counsel, and, if he is financially unable to obtain adequate representation, to have counsel appointed for him." Before the enactment of Section 3142(f), it is well known that bail was set in many districts throughout the federal system in the absence of the defendant and before the defendant had counsel.

Section 3142(f)'s creation of two other new procedural rights may be of substantially greater significance. For Section 3142(f) imposes the "clear and convincing" standard in regard to proof of a particular defendant's alleged dangerousness. And finally, Section 3142(f) contains a sentence which added a new right that was not generally accorded a defendant before Congress passed the 1984 Act. For that sentence in Section 3142(f) states that the defendant "shall be afforded an opportunity to testify, to present witnesses on his own behalf, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise."

There can be little doubt, of course, that under bail procedures followed before the enactment of Section 3142(f), a defendant did have and did exercise the right "to present information [to the judicial officer] by proffer or otherwise." Indeed, a defendant under the bail procedures generally followed before the 1984 Act was passed usually presented his information concerning bail to the judicial officer by way of "proffer." [12] Information was "otherwise" presented under old procedures either by stipulation of the parties or by the actual submission of documentary evidence.

The new provisions included in Section 3142(f), however, establish the right of a defendant "to testify" and to "present witnesses on his own behalf" and to "cross-examine witnesses who appear at the hearing." Those rights were not generally accorded a defendant under bail procedures followed before the enactment of the 1984 Act. Power and jurisdiction, of course, were vested in the judicial officer to insist upon the live testimony of witnesses or to require the government to establish the reliability of hearsay information. Power and jurisdiction were also vested in the judicial officer under the former practice to conduct an appropriate preliminary inquiry to determine whether the hearsay information presented against a particular defendant carried sufficient circumstantial guarantees of trustworthiness to establish the reliability of such hearsay information. *Cf.* Rule 803(24) and Rule 804(5) of the Federal Rules of Evidence. *See also Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

We believe that when the new safeguards were added to Section 3142(f), that the Congress apparently recognized that, in cases in which the government's motion for pretrial detention was grounded on a particular defendant's alleged dangerousness, that the detention hearing to be conducted by the judicial officer would, more times than not, involve the presentation of the live testimony of witnesses called by the government and would include the exercise by the defendant of his right of cross-examination as newly granted by Section 3142(f).

It may even be concluded that Congress' failure to grant the government the right "to present information *by proffer* or otherwise," while such a right was retained for the defendant, could be said to reflect a Congressional determination that the government would be required to present

---

11. A similar and consistent consideration was stated in Section 3142(j) which provides that "[n]othing in this section shall be construed as modifying or limiting the presumption of innocence."

12. Such a "proffer" simply reflected defense counsel's statement to the judicial officer of what factual data he believed could be established by the testimony of a live witness or witnesses or by documentary evidence.

its evidence of alleged dangerousness by means other than by proffer. We need not reach that question because we believe that there are quite practical solutions to the problems created by Section 3142(f)'s vagueness, which, if followed by the magistrates in this district, will avoid the problems created by the language of Section 3142(f) in regard to the type of hearing that should be conducted in a dangerousness case. We turn to that question.

### B.

■ The point of beginning is that recognized by Chief Judge Weinstein in his recent decision in *United States v. Colombo*, 616 F.Supp. 780, 784 (E.D.N.Y.1985).[13] It was there suggested that the adoption of Section 3142 procedures that would require "two evidentiary hearings—the first before the magistrate and the second before the district court"—should be avoided. (*Id.* at 784). Chief Judge Weinstein, we believe properly, stated that "the magistrate should conduct the bail application evidentiary hearing unless, in an unusual case, the district court judge, in the exercise of his or her discretion, reopens the matter for new evidence." (*Id.* at 784).

■ We carry that thought further by suggesting that the Section 3142 cases in which the district court judge, on *de novo* review, should be required to exercise his or her discretion to reopen a case should ordinarily be confined to cases in which a defendant may wish to offer newly discovered evidence.

■ It is our view that if the magistrate conducts the type of dangerousness detention hearing the Congress contemplated by its enactment of Section 3142(f), and provided the magistrate also makes appropri-

ate "written findings of fact" and includes in his detention order a "written statement of the reasons for the detention," that the necessity for the district court to reopen the case on *de novo* review would be reduced to a very small number of highly unusual cases. It is further our view that procedural difficulties would be avoided in most cases if the magistrate would fully and fairly advise the defendant at the outset of the Section 3142(f) hearing of his right "to testify, to present witnesses on his own behalf, [and] to cross-examine witnesses who appear at the hearing," as provided in that section. Should a defendant state, however, in response to that advice that he wishes to "present information by proffer or otherwise", again as is his right under Section 3142(f), the magistrate should, on the record, obtain a familiar *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), waiver of his Section 3142(f) right to testify, to present witnesses, and to cross-examine the government's witnesses. Such a procedure would not, of course, preclude the parties from entering into a stipulation of the evidence to be considered by the magistrate. The approval of such a stipulation, however, should be conditioned on the defendant's waiver of record of the other rights granted him under Section 3142.

■ And, finally, but of paramount importance, the magistrate should, as stated by the First Circuit in *Acevedo-Ramos*, through the sensible exercise of his or her discretion, insist that the government produce the testimony of live witnesses or, by conducting an appropriate preliminary inquiry, establish the reliability of the information upon which the government bases its claim of dangerousness.

There will, of course, be particular cases in which the names of threatened witnesses

---

**13.** We cite and discuss only the procedural aspects of *Colombo* and do not either cite or rely upon Chief Judge Weinstein's determination of the entirely different Section 3142 question presented in that case.

While we are in agreement with *Colombo*'s discussion of the procedures that should be followed in Section 3142 cases, and with other parts of that opinion, we entertain some doubt about *Colombo*'s determination of the merits of the Section 3142 question presented in that case.

or other persons must be protected. But the procedures followed in the District of Maryland in *Stanford* provide appropriate guidelines in regard to how such problems may be solved. If a particular defendant in such a case, or, indeed in any case, indicates that he or she does not wish to have the government present any direct evidence, once again, a *Johnson v. Zerbst* waiver should be stated on the record.

We are confident that the experienced Chief Magistrate and the other magistrates that serve this judicial district can adopt additional procedures under which, in all except rare and unusual cases, the only evidentiary hearing that need be conducted will be that conducted by the magistrate in accordance with the manner we have construed in Section 3142(f).

While the defendant objected to the Chief Magistrate's *in camera* review of the undisclosed information concerning the two murders, upon which paragraph 17 of the Chief Magistrate's findings was initially based, defendant's counsel, although afforded an opportunity to do so, did not proffer any evidentiary data for the Chief Magistrate's consideration. The record on *de novo* review by this Court establishes the Chief Magistrate's action in viewing the undisclosed information *in camera* is almost mooted. For the record also shows that the Chief Magistrate, in fact, set aside both paragraph 15 and paragraph 17 of the findings made in his original order. It should be added that the proceedings in this Court on *de novo* review also presented substantially different factual circumstances than those considered by the Chief Magistrate. For it is clear that during the course of the *de novo* review, the defendant did, in fact, proffer the two affidavits to which we have made earlier reference. That proffer had an obvious legal impact

upon the Section 3142(e) presumption relied upon by the Chief Magistrate and the government to support the detention order entered.

It is thus apparent that during the course of the *de novo* review, in sharp contrast to the procedures before the Chief Magistrate, the defendant did, in fact, meet his burden of coming forward with rebuttal evidence. The burden of persuasion that the government is required under the 1984 Act to establish by clear and convincing evidence thus continued to rest on the government.

■ All that remained to support the detention order was a group of 15 lewd photographs which the defendant's proffer suggests were taken during a "party" and which, in any event, cannot, in our judgment be said to establish the defendant's dangerousness by clear and convincing evidence. We recognize that a gun was used as a prop in connection with several of the photographs. We believe, however, that Chief Judge Weinstein was correct in *Colombo* when he concluded that "defects in character" may not be used "to predict violence." [14]

■ The only remaining factual circumstances established on *de novo* review relate to the fact that the defendant was armed at the time of his arrest and that a large number of guns were seized at the time the search warrant was executed. As we have already suggested, the presence of guns and narcotics go hand-in-hand in a substantial number of controlled substance prosecutions. If such evidence, standing alone, can be said to constitute clear and convincing evidence of dangerousness, a very substantial number of persons

---

**14.** We do not, of course, suggest that lewd photographs may never support a pretrial detention order. See, for example, *United States v. Yeaple,* 605 F.Supp. 85 (M.D.Pa.1985), in which a showing that the defendant had photographed many minors engaging in sexually explicit conduct was held to support a pretrial detention order in a prosecution under 18 U.S.C. § 2252(a)(2).

charged with Section 841(a)(1) violations would be subject to pretrial detention.[15]

We accordingly find and conclude that this case should be reversed and remanded to the Chief Magistrate in order that he may consider whether a release order which would include an appropriate combination of the conditions of release set forth in 18 U.S.C. § 3142(c) should be entered.[16]

IT IS SO ORDERED.

## EXHIBIT 1
### Magistrate's Case No. 85–0143H–01
### DETENTION ORDER

On October 3, 1985, a complaint was filed with the undersigned charging Harvey R. Ridinger with distributing hydromorphone, a Schedule II narcotic controlled substance, on or about September 10, 1985, in violation of 21 U.S.C. § 841(a)(1).

On October 4, 1985, the defendant was arrested and presented before the undersigned for his initial appearance on the complaint. Prior to the initial appearance, the Government filed a motion for a pretrial detention hearing and a motion to continue the hearing. The motion for continuance was granted, and the hearing was set for 9:30 a.m., October 7, 1985. The defendant was ordered into the custody of the United States Marshal pending the hearing.

A combined preliminary examination and detention hearing was held October 7, 1985. The Government appeared by Assistant United States Attorney Robert E. Larsen. The defendant was present in person and by retained counsel (retained for these proceedings only), Willard B. Bunch. The parties stipulated that the bail report of Pretrial Service Officer Jeffrey L. Burkholder be considered by the Court as the testimony Mr. Burkholder would provide if he was called as a witness. The parties also stipulated that the following exhibits may be received in evidence:

1. Exhibit H–1—Affidavit of Nancie Leigh Howley, Special Agent of the Federal Bureau of Investigation, made October 3, 1985, in support of an Application for Search Warrant for the search of the defendant's premises at 1601 Marsh, Blue Summit, Missouri;

2. Exhibit H–3—Inventory of items seized from the defendant's premises at 1601 Marsh, Blue Summit, Missouri, during the execution of a search warrant (issued by the undersigned) on October 4, 1985; and

3. Exhibit H–4—Inventory of items seized from the person of the defendant, on October 4, 1985, incident to his arrest.

The Government also offered in evidence Exhibit H–2, consisting of 15 color photographs seized from the defendant's residence during the execution of the above-mentioned search warrant. The defendant objected to the admissibility of the photographs on the ground that they were not material to the issue of detention versus release. After inspecting the photographs *in camera*, the undersigned concluded that the nature of the photographs are relevant to the issue of danger to other persons and the community and received the photographs in evidence with the provision that they are to be returned to Mr. Larsen for

---

**15.** Indeed, this Court imposed sentences in six Section 841(a) cases the day this memorandum opinion was drafted. Guns were involved under the circumstances of all those cases. The government, however, did not seek pretrial detention orders in any of those cases, except in the case of a native of Columbia who had illegally entered the United States. The detention order in that case, however, was based solely on flight rather than dangerousness grounds.

We do not believe that the limited number of persons that the Congress anticipated would be subject to pretrial detention would include such a large group of cases.

**16.** In light of the return of an indictment on November 13, 1985 which prays for forfeiture, it would be appropriate that the Chief Magistrate give consideration to include among other conditions, a forfeiture agreement condition as authorized by Section 3142(c)(2)(K).

retention pending further need by the undersigned or a district judge.

No other evidence was adduced by the parties, and there were no proffers.

On the basis of the information contained in the (1) Court file, (2) bail report, and (3) Exhibits H–1, H–2, H–3, and H–4, the undersigned finds that:

1. On April 25, 1985, state and local officers searched the defendant's residence (a house trailer) situated at 1601 Marsh, Blue Summit, Missouri, pursuant to a search warrant issued by a Jackson County, Missouri, Associate Circuit Judge and seized a considerable number of tablets of hydromorphone, benphetamine, and methylphenidate, all being Schedule II controlled substances;

2. A paid informant (Diana Singleton) of the Federal Bureau of Investigation, whose reliability has been established by independent investigation and surveillance as shown in the affidavit which is Exhibit H–1, has known the defendant for approximately four and one-half to five years and purchased dilaudid on a regular basis (usually once a week) from the defendant, usually trading stolen property for the dilaudid. The defendant has told the informant that he grosses approximately $100,000.00 per month from the sale of dilaudid at $50.00 per tablet. The informant has seen the defendant armed with a handgun during "drug" transactions;

3. On August 29, 1985, the above-mentioned informant (Diana Singleton) made a controlled (at the direction of and under the surveillance of agents of the Federal Bureau of Investigation) purchase of three tablets of dihydromorphinone HCL, a Schedule II narcotic controlled substance from the defendant. The informant gave the defendant a Sony color television set, (provided by the agents) which she represented to the defendant to be stolen, in exchange for the three tablets. The informant also gave the defendant 30 cartons of cigarettes (also provided by the agents) which she represented to the defendant to be stolen as a partial payment toward a previously incurred narcotic debt. During this transaction, the defendant pointed a gun at the informant;

4. On September 4, 1985, the above-mentioned informant (Diana Singleton) made a controlled (at the direction of and under the surveillance of agents of the Federal Bureau of Investigation) purchase of two tablets of dihydromorphinone HCL, a Schedule II narcotic controlled substance, from the defendant. The informant gave the defendant $100.00 in cash for the two tablets. The informant also gave the defendant 35 cartons of cigarettes (provided by the agents) which she represented to the defendant to be stolen, as a partial payment toward a previously incurred narcotic debt. During this transaction, the informant observed several firearms in plain view in the living room area of the defendant's house trailer;

5. On September 10, 1985, the above-mentioned informant (Diana Singleton) made a controlled (at the direction of and under the surveillance of agents of the Federal Bureau of Investigation) purchase of ten tablets of dihydromorphinone HCL, a Schedule II narcotic controlled substance, from the defendant. The informant gave the defendant $500.00 in cash for the ten tablets. The informant also gave the defendant 25 cartons of cigarettes (provided by the agents), which she represented to the defendant to be stolen, as a partial payment toward a previously incurred narcotic debt. During this transaction, the informant observed three or four handguns on a table in the living room of the defendant's house trailer;

6. On October 4, 1985, agents of the Federal Bureau of Investigation searched

the defendant's premises at 1601 Marsh, Blue Summit, Missouri, pursuant to a search warrant issued by the undersigned. Among the items seized were:

a. A quantity of tablets suspected to be controlled substances;

b. The Sony television set which the informant gave to the defendant on August 29, 1985;

c. A triple beam scale; and

d. Approximately 16 handguns, 7 shotguns, and 11 rifles;

7. Incident to the arrest of the defendant on October 4, 1985, agents of the Federal Bureau of Investigation searched the person of the defendant and seized a .22 caliber, 4-shot, derringer with four live cartriges in the chamber;

8. The defendant, a 50-year old white male, has resided in the Kansas City Metropolitan area since 1945;

9. The defendant's mother, ex-wife (from whom he was divorced in 1976), and four children (ranging in age from 19 to 32) reside in the Kansas City area, but he has very little contact with any of them;

10. The defendant has owned and operated Metal World, a scrap metal business, for the past five years, earning approximately $300.00 per week;

11. The defendant's assets consist of the following:

a. Business at 1601 Marsh, Blue Summit, Missouri, which he values at $150,000.00, on which there is a mortgage of $17,000.00;

b. House at 4914 Sterling, Kansas City, Missouri, which he values at $80,-000.00, on which there are mortgages totaling $14,000.00; and

c. 1974 Cadillac automobile, 1975 Cadillac automobile, and a 1964 Buick automobile;

12. Exhibit H–2, 15 polaroid photographs, includes several photographs of the defendant's sex organ pierced by various sharp pointed objects such as a nail, a hypodermic needle, and earrings. There are other photographs included in the exhibit showing an unclothed female in various poses, including one with a pistol pointed at her genitalia;

13. The defendant sustained two convictions in the Municipal Court of Kansas City, Missouri, on April 8, 1982, one of the offense of carrying a concealed weapon, and the other of of the offense of obstructing an officer;

14. If convicted of the offense charged in the complaint, the defendant faces a sentence to imprisonment for a period of 15 years and a fine of $125,000.00. In addition, it is quite likely that, in view of the seizures on April 25, 1985, and October 4, 1985, and the purchases made by the informant (Diana Singleton) August 29, 1985, and September 4, 1985, that additional charges of (a) distribution of a controlled substance, (b) possession of stolen property, and (c) using a firearm in the commission of a felony will be filed;

15. A house, owned by the defendant, situated at 1601 Marsh, Blue Summit, Missouri, was destroyed by fire, and The Maryland Casualty Insurance Company has refused to pay the $52,-000.00 fire insurance claim because the fire has been ruled as arson;

16. Exhibit H–1 clearly shows that (a) there are reasonable grounds to believe that the offense charged in the complaint was committed and that the defendant committed the offense, and (b) there is substantial evidence of the defendant's guilt; and

17. The undersigned has been provided, *in camera*, with information (which cannot be made public because to do so may jeopardize the life of the source) that the defendant has been involved in the murder of two individuals because they were snitches.

On the basis of Findings Numbered 1, 2, 3, 4, 5, 6, 7, 12, 13, 14, 15, 16, and 17, the

undersigned finds that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community. It is, therefore,

ORDERED that the defendant be committed to the custody of the Attorney General or his authorized representative for detention pending the completion of the trial. It is further

ORDERED that the defendant be confined in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. It is further

ORDERED that the Attorney General or his authorized representative ensure that the defendant is afforded reasonable opportunity for private consultation with his counsel. It is further

ORDERED that, on order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which the defendant is confined deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

/s/ Calvin K. Hamilton
CALVIN K. HAMILTON
Chief United States
Magistrate

Kansas City, Missouri
October 7, 1985

## EXHIBIT 2

21 U.S.C. § 841(a)(1) NMT 15 years and/or $125,000 Special Parole Term of 3 years Special Assessment of $50.00

### INDICTMENT

THE GRAND JURY CHARGES THAT:

### COUNT ONE

On or about April 25, 1985, at Kansas City, in the Western District of Missouri, HARVEY R. RIDINGER did knowingly and intentionally possess with intent to distribute Methylphenidate, a Schedule II controlled substance, all in violation of Title 21, United States Code, Section 841(a)(1) and Section 841(b)(1)(B).

### COUNT TWO

On or about August 29, 1985, at Kansas City, in the Western District of Missouri, HARVEY R. RIDINGER knowingly and intentionally distributed hydromorphone, a Schedule II controlled substance; all in violation of Title 21, United States Code, Section 841(a)(1), and Section 841(b)(1)(B).

### COUNT THREE

On or about September 4, 1985, at Kansas City, in the Western District of Missouri, HARVEY R. RIDINGER knowingly and intentionally distributed hydromorphone, a Schedule II controlled substance; all in violation of Title 21, United States Code, Section 841(a)(1), and Section 841(b)(1)(B).

### COUNT FOUR

On or about September 10, 1985, at Kansas City, in the Western District of Missouri, HARVEY R. RIDINGER knowingly and intentionally distributed hydromorphone, a Schedule II controlled substance; all in violation of Title 21, United States Code, Section 841(a)(1), and Section 841(b)(1)(B).

### FORFEITURE

Pursuant to Title 21, United States Code, Section 853(a)(2), the defendant HARVEY R. RIDINGER shall forfeit to the United States of America the following property, which was used, and was intended to be used, to commit and facilitate the commission of the aforementioned offense:

Lot 15, Resurvey of Block 11, Stark Acres, Jackson County, Missouri, and all appurtenances and improvements thereto, otherwise known as 1601 Marsh, Kansas City, Missouri.

A TRUE BILL.

Foreman of the Grand Jury

ROBERT E. LARSEN
Assistant United States Attorney