**UNITED STATES of America, Appellee,**

v.

**Hector ACEVEDO–RAMOS, Defendant, Appellant.**

**No. 84–2056.**

United States Court of Appeals, First Circuit.

Heard Jan. 10, 1985.
Decided Feb. 25, 1985.

William M. Kunstler, New York City, and Luis F. Abreu Elias, Hato Rey, P.R., for defendant, appellant.

H. Manuel Hernandez, Asst. U.S. Atty., Hato Rey, P.R., for appellee.

Before BREYER, ALDRICH, and TORRUELLA, Circuit Judges.

BREYER, Circuit Judge.

The appellant, Hector Acevedo Ramos, is now in custody under the authority of the new Bail Act, 18 U.S.C. §§ 3141 *et seq.*, which allows detention pending trial of persons whose release would pose a serious threat to "the safety" of any other person or "the community". *Id.* § 3142(e). This appeal does not raise the central question of the constitutionality of the Act's new "preventive detention" provisions, as Acevedo is held in custody for a traditional reason—namely that, if released, he may try to tamper with his trial, by, for example, interfering with witnesses or jurors or otherwise "obstructing justice," *see* 18 U.S.C. §§ 1501–1515. We reject Acevedo's central legal claim—that the magistrate and district court cannot rely upon hearsay evidence when denying him release—for the lawfulness of the practice of using hearsay evidence at bail hearings is well established. Nothing in the new Act forbids the use of hearsay, where reliable. The evidence presented at the detention hearing is sufficient to justify the conclusions of both magistrate and district judge that Acevedo ought to be detained. We therefore affirm the district court's decision. 600 F.Supp. 501.

I

On November 15, 1984, a federal grand jury indicted Acevedo and several others charging them with having robbed the Taillex Company of over $600,000 worth of diamonds. *See* 18 U.S.C. §§ 2, 1951 (substantive and conspiracy offenses). After Acevedo was arrested, the government sought a pretrial "detention hearing," under the authority of § 3142(f) of the new Bail Act. At the hearing, held before a federal magistrate, the government supported its request for Acevedo's detention with the testimony of an FBI agent, Jeffrey Hill.

Hill stated that he was in charge of the FBI's investigation of the Taillex robbery. He said that the defendant and others had planned the robbery; and that the others had kidnapped the Taillex office manager, had forced him to open the Taillex safe, had taken about 770 diamonds (that had been shipped to Taillex from New York), and had given the diamonds (valued at $620,000) to Acevedo (in return for $135,000). In Hill's words:

Hector Acevedos [sic] conceived the robbery. He conducted surveillances of the plant with another individual, and also of

a manager of one of the two plants, knowing that an abduction of one of the managers was going to be one of the methods in which the thing was carried out, and following the actual robbery— receiving the goods—he received them and paid for them. The money was split by the other participants.

Acevedo's counsel cross-examined Hill. The magistrate then found "probable cause" to believe that Acevedo had committed the offenses charged.

Hill went on to testify about Acevedo's alleged "dangerousness." He said that the FBI had evidence that Acevedo had previously participated in several serious crimes —"reliable" evidence that consisted of informant information, statements made by other participants in the crime, and tape recordings. The previous crimes, he said, included: 1) the murder-robbery in 1974 of a jeweler, Leo Dershowitz; 2) the murder-robbery in 1974 of another jeweler, Howard Block; 3) the murder-robbery in 1974 of a third jeweler, Abraham Shafizadeh; 4) a conspiracy to murder and to rob the owner of a gold manufacturing company; 5) an armed robbery of the Conseguera jewelry store in Mayaguez in 1981; 6) the burglary of the Gordon jewelry store in 1980 (and a related kidnapping); 7) an attempt to buy a police file with information about the investigation of the Shafizadeh murder; 8) bribery of jurors in two prosecutions brought against Acevedo based on his attempted purchase of the Shafizadeh investigatory file.

Agent Hill testified about many, but not all, of these incidents in some detail. In most instances he said that his information was based upon interviews with actual (cooperating) participants in the crime. In many instances he said that he had corroboration from tape recordings containing the voices of other participants in the crimes. In the Gordon jewelry store abduction/robbery, for example, he said:

> we have got ... a statement of a participant [and we] have got a victim's statement that corroborates exactly letter-by-

letter just about how the participant stated it occurred.

In the investigatory file matter, Hill said that Acevedo had tried to buy the Shavizadeh file from an undercover policeman in order to "destroy [the file,] ... to determine the witnesses that he suspected had been found ... and kill those witnesses." He said Acevedo was caught in the act. He said that his information consisted of testimony of the policeman, tape recordings on which Acevedo's voice was heard, and photographs of the actual purchase transaction (which Hill had with him). Hill added that Acevedo had been tried twice for the crime, but, in each instance, the trial had resulted in a hung jury. Hill said that the FBI had information that Acevedo "paid over a hundred thousand dollars" to bribe enough jurors to obtain nonverdicts. This information came from "[FBI Form] 302 testimony [from] agent interview" of persons "reliable in the past" including a "cooperating defendant in another matter."

Acevedo had two attorneys who cross-examined Hill on two occasions. Counsel sought, through cross-examination, to discredit the reliability of Hill's statements (for example, by pointing out that Acevedo had not been convicted of trying to purchase the police file). Counsel were hampered in their efforts to discredit Hill, however, by the government's refusal to allow Hill to name the witnesses whose statements the FBI relied upon or to provide other information that might enable Acevedo to identify them. The government said that such identification might endanger the witnesses' lives. It added that identification might hamper its ongoing investigation into the claimed jury-tampering efforts. And, it said, in respect to the Taillex robbery/probable cause aspect of the case, that it need not provide Acevedo with a detailed picture of the evidence it would use at trial. Defense counsel sought public disclosure of the evidence underlying Hill's testimony; they did not ask the magistrate to review that evidence *in camera.*

The magistrate initially decided to detain Acevedo pending trial. He concluded in relevant part that

there is a serious risk that the defendant will obstruct or attempt to obstruct justice. No condition or combination of conditions can assure the safety of the Government's witnesses and the community, or insure the proper administration of justice in the defendant's case.

After hearing several character witnesses testifying in Acevedo's favor, the magistrate later reaffirmed that conclusion. Acevedo asked the district court to revoke or to revise the magistrate's order. After considering the transcript and listening to defendant's arguments of law, the district court refused to do so. Acevedo now appeals from that district court decision.

Acevedo, anxious for a speedy decision, did not file separate briefs in this court, but simply presented oral argument. We have nonetheless examined the arguments made below with care, we have read the entire record, including the hearing transcript, and, on the basis of our own research, we are convinced that the decisions of the district court and the magistrate are lawful.

## II

■■■ We note at the outset two well-established propositions of law. First, the right of an accused person to bail, while critically important, *Stack v. Boyle,* 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed. 1 (1951), is not absolute. Where risk of flight is unusually great, a court may deny bail and keep a defendant in custody in order to insure that the trial will take place. *United States v. Abrahams,* 575 F.2d 3 (1st Cir.) (upholding against statutory and Eighth Amendment challenges pretrial detention without bail where risk of flight was exceptional), *cert. denied,* 439 U.S. 821, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978); *United States v. Melville,* 306 F.Supp. 124, 127 (S.D.N.Y.1969) (bail may be denied in cases presenting exceptional flight risk). Similarly, where the court finds that a defendant's release creates an unusual risk of obstruction of justice, the Constitution and

relevant statutes permit detention. *United States v. Graewe,* 689 F.2d 54 (6th Cir. 1982) (per curiam) (upholding pretrial detention without bail where necessary to protect witnesses and judicial process); *United States v. Gilbert,* 425 F.2d 490, 491–92 (D.C.Cir.1969) ("courts have the inherent power to confine the defendant in order to protect future witnesses at the pretrial stage as well as during trial"); *cf. United States v. Bentvena,* 288 F.2d 442 (2d Cir.1961) (upholding against statutory and Fifth and Eighth Amendment challenges revocation of bail during trial where necessary to protect integrity of judicial proceedings). The second of these bail exceptions flows logically from the first, for an eventual trial that reflects witness intimidation or jury tampering is as bad as no trial at all.

Second, magistrates and judges traditionally have been permitted to base their decisions, both as to release conditions and as to possible detention, on hearsay evidence, such as statements from the prosecution or the defendants about what they can prove and how. This authority rests primarily upon the need to make the bail decision quickly, at a time when neither party may have fully marshalled all the evidence in its favor. It may also reflect the realization that at least some hearsay on some occasions may be fairly reliable, perhaps more reliable than certain direct evidence. For example, well-kept records, though hearsay, may be more reliable than eyewitness accounts of, say, a road accident on a foggy night. In any event, the need for speed necessarily makes arraignments, "probable cause" determinations, and bail hearings typically informal affairs, not substitutes for trial or even for discovery. Often the opposing parties simply describe to the judicial officer the nature of their evidence; they do not actually produce it. *See, e.g.,* Fed.R.Evid. 1101(d)(3); Fed.R.Crim.P. 5.1(a); Uniform Rules of Criminal Procedure § 344(f), 10 U.L.A. 103 (1974); *see generally Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *United States v. Edwards,* 430 A.2d 1321 (D.C.

App.1981) (en banc), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141 (1982).

Given this background, the two open legal issues that this appeal raises are: 1) whether the new Bail Act changes the evidentiary rules and now forbids magistrates to rely upon hearsay evidence in ordering detention; and 2) whether the record here contains sufficient evidence to warrant a detention decision. We consider each question in turn.

a. Several features of the new Bail Act support appellant in his claim that, regardless of past practice, detention can no longer rest upon hearsay evidence. First, the Act significantly extends the scope of pretrial detention, authorizing judicial officers to keep accused persons in custody, not only on grounds of risk of flight, or of obstructing justice, but also on grounds of general "dangerousness"—that, if released, for example, they might commit other crimes. *See generally* S.Rep. No. 225, 98th Cong., 1st Sess. (1983). Appellant argues that this broadening of the bases for detention (the constitutionality of which is not here in issue) led Congress to narrow the courts' authority as to the *type* of evidence upon which a confinement decision may rest.

Second, appellant's claim draws some support from the new statute's language. The statute provides that the courts can detain allegedly dangerous persons—those whose release puts at serious risk "the safety of any other person [or] the community," 18 U.S.C. § 3142(f)—only if the finding of dangerousness is "supported by clear and convincing evidence." *Id.* Moreover, the accused person has a right to representation by counsel, "to testify, to present witnesses ..., to cross-examine witnesses who appear ..., and to present information by proffer or otherwise." *Id.* This language seems to foresee a more elaborate and formal proceeding than current practice exemplifies.

Third, one might ask how the specific statutory right to cross-examine can be made meaningful where hearsay is at issue. How can the accused cross-examine a witness who does not appear? How can he question information, the source of which remains confidential? Must Congress not have intended that the government produce such witnesses or sources at the detention hearing?

Despite the strength of these arguments, our reading of the statute and legislative history convinces us that Congress did not intend to forbid the judicial officer to rely upon investigatory descriptions of evidence (and similar hearsay) where the judicial officer reasonably concludes that those descriptions, reports, and similar evidence, in the particular circumstances of the hearing, are reliable. For one thing, the new statute itself (in the very section granting a defendant procedural rights) explicitly states that "[t]he rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f).

For another thing, the relevant legislative history states that Congress intended to retain the informality of pre-existing bail hearings. The Senate Committee report, in describing the statutory language we have quoted, says:

> It is the intent of the Committee *to retain current law* so that any information presented or considered in any of the release or detention proceedings need not conform to the rules of evidence applicable at trial.

S.Rep., *supra,* at 22 n. 65 (emphasis added). Neither the new statute nor its history reflects any effort to modify Fed.R.Evid. 1101(d)(3), which specifically exempts bail hearings from the evidentiary rules prohibiting the use of hearsay.

Further, the magistrate or judge possesses adequate power to reconcile the competing demands of speed and of reliability, by selectively insisting upon the production of the underlying evidence or evidentiary sources where their accuracy is in question. Through sensible exercise of this power of selection, the judicial officer can make meaningful defendant's right to cross-examine without unnecessarily transforming

the bail hearing into a full-fledged trial or defendant's discovery expedition. In fact, even in an unusual case, where the government provides strong special reasons for keeping its evidentiary sources confidential (*e.g.*, protecting witness safety), the magistrate or judge, upon defendant's request, can still test the veracity of the government's testimony and the quality of the underlying evidence, by, for example, listening to tapes or reading documents *in camera. Cf. United States v. Stanford,* 551 F.Supp. 209, 210–11 (D.Md.1982) (upholding bail hearing *in camera* inspection requested by *government* over defendant's opposition).

Finally, this interpretation of congressional intent is confirmed by the fact that Congress, in designing the new statute, relied heavily upon a similar statute in effect in the District of Columbia and upon the case of *United States v. Edwards, supra,* in which the District of Columbia Court of Appeals upheld the statute. *See* S.Rep., *supra* at 7–10, 22. When enacting the earlier statute, the House Judiciary Committee stated that

> as is the present practice under the Bail Reform Act, ... the use of sworn testimony will be the exception and not the rule.... [B]ail hearings under the Bail Reform Act, which frequently result in detention of the accused, proceed primarily by way of proffers. They are not formal trials requiring strict adherence to technical rules of evidence. *If the court is dissatisfied with the nature of the proffer, it can always, within its discretion, insist on direct testimony.* But the discretion should be left to the court without imposing on it the burden of limiting admissibility to that it would permit a jury to hear.

H.R.Rep. No. 907, 91st Cong., 2d Sess. 182, 184 (1970) (emphasis added). When it upheld the lawfulness of the District of Columbia Act, all eight judges who discussed the hearsay issue said that hearsay alone could meet the "clear and convincing" evidentiary requirements of that statute, *United States v. Edwards,* 430 A.2d at 1334 (quoting above-quoted language of

H.R.Rep. No. 907); *id.* at 1360 n. 16 (Ferren, J., concurring in part and dissenting in part).

■ For these reasons, we conclude that Congress, in enacting the new Bail Act, did not change pre-existing law, which, as a general matter, allowed a magistrate or judge to consider hearsay evidence and to rest a determination upon that evidence where it is sufficiently reliable.

■ b. We must still ask whether the evidence presented to the magistrate in this case—through the testimony of Agent Hill—was sufficiently strong and reliable to meet the statutory "clear and convincing evidence" requirement. We believe that it was for the following reasons.

First, Agent Hill's testimony was given under oath and was for the most part detailed and consistent. It described the nature of the evidentiary sources upon which it relied—tapes, photographs, coconspirator statements, interviews, and so forth—sources that suggest a strong evidentiary basis for Hill's conclusions. Defendant's ability to cross-examine Hill provided at least some check on Hill's veracity.

Second, Hill's testimony indicates that most of the evidence supporting his "obstruction of justice" conclusion (in respect to the Shavizadeh file) was publicly available. The government had presented it in two trials against defendant. Defendant was thus aware of the evidence. He could have questioned Hill about it or presented conflicting evidence. His counsel's failure to do so indicates that the accuracy of Hill's description of that evidence was not in question. (Indeed, Acevedo does not here claim that Hill's description of this evidence was inaccurate.)

Third, Acevedo made no effort to challenge the accuracy of Hill's descriptions of the tapes or FBI interviews of co-conspirators. The government hampered his ability to do so by denying him descriptions of this evidence that might be used to identify witnesses. But, Acevedo might at least have asked the magistrate to review the tapes or interview information *in camera. Cf. United States v. Stanford, supra.* Such examination offers a practical way to

reconcile the (here plausibly established) need for witness protection with defendant's reasonable interest in securing an independent judicial check on the quality of the evidence the government advances as a ground for his detention. We do not here mean to suggest that *in camera* presentation of evidence is often desirable or often permissible except in a very unusual case. Rather, we mean simply that in the very unusual case in which strong special reasons warrant confidentiality—and where the defendant is apprised of the gist of the evidence through government testimony at the hearing—the magistrate's independent, though *in camera,* review of the underlying evidence at defendant's request offers the defendant greater protection than no independent check at all. *Cf.* Fed.R. Crim.P. 16(d)(1). Defendant's failure even to ask for such a check, or in any way to cast doubt on the accuracy of Agent Hill's descriptions here tends to justify the magistrate's decision to accept those descriptions as accurate. And, if accurate, they justify detention.

Fourth, Acevedo's primary attack on Hill's evidence consists of the claim that the magistrate ought to reject it—in respect to the obstruction of justice/file purchasing charge—because two juries, when presented with this evidence, failed to convict Acevedo of "obstruction of justice." Yet Hill also testified that the government had reliable information (including testimony of cooperating codefendants) that Acevedo had twice avoided conviction by tampering with the jury.

Under these circumstances, the magistrate was free to take both earlier and later evidence of obstruction of justice into account. Indeed, when it passed the new Bail Act, Congress specifically referred to the question of whether the magistrate could rely on a defendant's past bad conduct that had led to indictment but not conviction. The Senate Judiciary Committee wrote in its report:

> Under current law, consideration of a defendant's criminal history is confined to his record of convictions. See 18 U.S.C. [§] 3146(b). While a prior arrest should not be accorded the weight of a prior conviction, the Committee believes that it would be inappropriate to require the judge in the context of this kind of hearing to ignore a lengthy record of prior arrests, particularly if there were convictions for similar crimes. *Similarly, it would be improper to prohibit consideration of prior arrests if there were also evidence that the failure to convict was due to the defendant's intimidation of witnesses.* In any event, independent information concerning past criminal activities of a defendant certainly can, and should, be considered by a court.

S.Rep., *supra,* at 23 n. 66 (emphasis added). We see no statutory or constitutional obstacle to carrying out Congress's expressed intent on this point.

For these reasons, we conclude that the evidence that release of Acevedo would have posed an unacceptable risk of obstruction of justice was "clear and convincing." Under the circumstances presented here, neither the new Bail Act nor the Constitution prohibits the government's presentation of this evidence at the detention hearing through the testimony of Agent Hill. The decision of the district court allowing Acevedo's detention pending trial is

*Affirmed.*