**UNITED STATES of America, Plaintiff**

v.

**Luis M. Rivera CRUZ, Defendant.**

**Criminal No. 05–079 (DRD).**

United States District Court,
D. Puerto Rico.

March 29, 2005.

Jacabed Rodriguez–Coss, United States Attorney's Office, San Juan, PR, for Plaintiff.

Joseph C. Laws, Federal Public Defender's Office, Hato Rey, PR, Ricardo R. Pesquera–Annexy, Ricardo R. Pesquera P. A., Orlando, FL, for Defendant.

### *ORDER OF RELEASE*

GELPI, United States Magistrate Judge.

The defendant in this case stands charged in a one count indictment for bank fraud, in violation of 18 U.S.C. § 1344. Said offense carries maximum penalties of 30 years imprisonment, a fine up to $1,000,000.00, and a term of supervised release of five years.

The Government has moved to detain defendant pending trial. Upon his initial appearance on March 15, 2005, the Government moved for a three day continuance of the detention hearing. The Court, pursuant to 18 U.S.C. § 3142(f), granted the request. On March 18, it held a detention hearing. Upon finding good cause under Section 31342(f), as well as based on a request from defense counsel, the Court continued the hearing to March 28, 2005.

Following the two session, approximately eight hour long evidentiary hearing, the Court is ready to issue its ruling and findings. *See* 18 U.S.C. § 3142(h)(I) (requiring release order to set forth the conditions of release in a clear and specific manner); *see also* Fed. R.App. P. 9(a) (requiring district court to state in writing the reasons for imposing conditions of release). Having carefully considered and weighed the evidence presented by the parties, the Court concludes that defendant's pretrial release is warranted, subject to the conditions of release provided subsequently in this order.

The Government has moved for defendant's pretrial detention on both risk of flight and danger to the community grounds. *See* 18 U.S.C. § 3142(e). The first ground must be proven by a preponderance of the evidence. *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir.1991). The second ground requires proof by clear and convincing evidence. 18 U.S.C. § 3142(f); *United States v. Mantecon–Zayas*, 949 F.2d 548, 551 (1st Cir.1991).

Section 3142(g) sets forth several factors which the Court must consider in determining whether to release or detain a defendant. These are:

(1) the nature and circumstance of the offense charged;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person (*i.e.*, his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community and ties therein, past conduct and criminal history); and,

(4) the nature and seriousness of the danger posed to any person or the community by the defendant's release.

Pursuant to 18 U.S.C. § 3142(f)(2)(B), the Court may also consider evidence to the effect that a defendant obstructed or attempted to obstruct justice, or threatened, injured or intimidated, or attempted to, a prospective witness or juror. The First Circuit, however, has been clear in noting that said conduct must pertain to the charged federal offense. *See United States v. Ploof,* 851 F.2d 7, 11 (1st Cir. 1988) (holding that if defendant's actions are unrelated to and unlikely to affect proceedings on present charges, detention is not authorized).

A summary of the Government's detention evidence and arguments now follows:

(1) *The defendant's travels*—The evidence shows that defendant frequently travels abroad. In the past three years he has traveled to the Dominican Republic approximately 100 times. *See, e.g.,* testimony of Rosa Martínez Nuñez. He has also traveled to Cuba several times. *See, e.g.,* testimony of Harold Rivera Orengo. The Government suggests that this evidence is probative of his risk of flight.

(2) *The defendant's ties outside the U.S.*—The evidence also shows that defendant has business ties in the Dominican Republic. Presently, he has a contract for security consulting services with said country's senate. *See, e.g.,* testimony of attorney Mar-

io Prieto. He also has a paramour by the name of Carolina in the Dominican Republic, and has a daughter from their relationship. *Id; see also* Government's Exhibits 5 and 9. He has acquaintances in Cuba. *See, e.g.,* Government's Exhibit 10. He has relatives of his current wife in Colombia, her native country. *See, e.g.* testimony of Harold Rivera Orengo. The Government also suggested, but was unable to prove, that defendant owns property in Cuba or the Dominican Republic. The Government suggests that this evidence is also probative of defendant's flight risk.

(3) *The defendant's religious conviction*—The evidence shows that defendant is a practitioner of *"Palerismo"*, a religious practice. *See, e.g.,* testimony of Rosa Martínez Nuñez, Harold Rivera Orengo, and Mario Prieto. When arrested, en route to the Dominican Republic, defendant was in the possession of various artifacts used by *"Paleristas"*, such as stones, bead necklaces, horns and a book on black magic. *See* Government's Exhibit 4 and artifacts in Government's custody. He practices his cult in his farm in Cubuy, as well as in the Dominican Republic and Cuba. *See* testimony of S.A. Margaret Till, Harold Rivera Orengo, Rosa Martínez Nuñez, and Mario Prieto. The Government also presented testimony to the effect that a confidential informant stated that he was told that defendant also used human bones in the religious practice. *See* testimony of S.A. Till. No evidence to corroborate this last fact was, however, presented. The Government suggests that defendant's cultist worshiping is indicative of his intent to do harm to the Government

witnesses and personnel involved in this case. Although magical spells and incantations cannot be grounds *per se* for his detention, these nonetheless evidence defendant's desire that these persons be harmed.

(4) *The defendant's propensity to fabricate and provide false information*—The Government presented several instances of conduct by defendant in which he shows a propensity to fabricate and provide false information. For example, at the time of his arrest he had on his person two U.S. passports, *see* Government's Exhibit 6, as well as two drivers licenses, one from Florida and the other from Puerto Rico. *See* Government's Exhibit 7. All are in his name. The Government revealed that defendant requested a new passport, alleging he had dropped his lost one in the waters of Vieques. *See* testimony of S.A. Margaret Till. A review of the same shows that the first passport never got wet. Also, it appears that the old one was never used again, once the replacement one was issued. The Government also notes that defendant failed to disclose to Pretrial Services his travel to Cuba. The Court notes that the PTS report at page 2 provides "He reported to possess a passport and having traveled to the Dominican Republic, Colombia, Peru, Chile, Europe among other countries." The Government also notes that aside from providing the names of his current spouse and their two children, defendant failed to report the names of his five or six other offsprings from other relationships. The Government further notes that at the time of his pretrial interview, he failed to provide finan-

cial information. The PTS report at page 2 notes that defendant did so upon counsel's advice. Finally, the Government presented two resumes (one in Spanish and the other in English) of defendant. *See* Government's Id. 15 and 16. In the same defendant boasts his curriculum vitae by stating, for example, that he was a U.S. Naval Commander, has top U.S. security clearance, has experience inspecting nuclear facilities, etc. The Government suggests the above evidence is probative of risk of flight, as well as of his dangerousness, when combined with all the other evidence.

(5) *Defendant's intent and ability to harm Government witnesses and personnel*—The Government presented testimony to the effect that a confidential witness told the FBI agents investigating this case that he felt defendant would do harm to Government witnesses, prosecutors as well as judges involved in this case. *See* testimony of S.A. Rafael Collado and Margret Till. For example, upon the confidant's tip, a list of names was found in the computer of defendant's administrative assistant, Ms. Rosa Martínez Nuñez. *See* testimony of S.A.'s Collado and Till; *see also* Government's Exhibit 1. This list contains the names of counsel for Banktrust (plaintiff in an earlier related civil bank fraud case brought against defendant and others); the names of prosecutors and one former agent in this criminal case, the names of the judicial officers in the Banktrust case, as well as names of persons involved in other civil matters brought against defendant's company.

The Government also presented testimony to the effect that in 2002 it received a statement from its confidential informant to the effect that defendant was dangerous and had a hit man in Cubuy, Canóvanas, Puerto Rico, nearby defendant's property. *See* testimony of S.A. Margaret Till.

Also, the Government presented evidence to the effect that the confidential witness told the FBI that defendant stated "cuando venga de Cuba se van a joder todos" (when I return from Cuba they are all going to set fucked—translation by the Court). The witness felt that defendant was referring to the persons in the computer list. This same witness also heard the defendant's son, Harold, comment in front of him "si lo quitamos, no tendrán caso" (if we take him out of the picture the Government will not have a case—translation by the Court). *See* testimony of S.A. Margaret Till. This statement was in reference to defendant—turned Government witness, Guido Barletta Blasini, who is presently over eighty years of age and is terminally ill.

Finally, the Government presented evidence that following the first day of the detention hearing, defendant's son, Harold, went to home of a Government witness, Mr. Carlos Torres, a former employee of defendant. *See* testimony of S.A. Margaret Till. Harold pounded on Rivera's door and allegedly carried a gun at the time. Harold refused to speak to the FBI about the incident. The Government suggests that the above evidence is probative of defendant's dangerousness and ability to do others harm in relation to this case.

(6) *Defendant's Criminal History*—The defendant has a 1984 conviction for involuntary manslaughter. The Pretrial Report shows that he was

charged with homicide, pled guilty to the lesser charge, and was sentenced by a Commonwealth Superior Court Judge to one year probation. The Government offered no details of this conviction, other than the information contained in the PTS report. The Government stresses the fact that defendant informed PTS he had no prior criminal record. *See* PTS report at page 3.

(7) *Defendant's attempt to destroy evidence*—The Government presented evidence to the effect that another confidential witness informed the FBI that he/she thought that documents in defendant's possession were in danger of being destroyed. Although no instructions were given by defendant nor anyone else to said effect, he nevertheless asked Christian, the computer person, what would happen if the computer files were to be erased, and if these could be later recovered.

The above is a summary of all the evidence presented by the Government. Now, the Court will summarize that presented by the defense.

(1) *Defendant is candid about his travels abroad and his religious activities*—The defendant presented evidence to the effect that it is no secret he travels frequently to the Dominican Republic, as well as to Cuba. *See, e.g.,* testimony of Rosa Martínez Nuñez, Harold Rivera Orengo and Mario Prieto. It is also known that he is an active *"Palerista"*. *Id.* In fact, he displays his religious artifacts in his office. *See* testimony of Rosa Martínez Nuñez.

(2) *Defendant's conviction and paramour in the Dominican Republic are also known facts*—Defendant's administrative assistant, son and civil/corporate attorney (Mr. Prieto) all knew about Carolina, his paramour in the Dominican Republic. *See* witness' respective testimony. Specifically, attorney Prieto stated that defendant did not conceal this fact when they both met in the Dominican Republic and Carolina was present.

Defendant's son Harold also testified he knew that many years ago his dad was involved in an auto accident involving a death, but did not know the outcome of the matter. (At that time, Harold, who is now 34 years of age, must have been 13 or 14 years old).

(3) *The "hit list" was prepared by defendant's administrative assistant*—Ms. Martínez Nuñez testified that the list containing the names of counsel and government personnel was prepared by her and updated. She also noted that it includes names of other persons involved in other state court matters.

(4) *Defendant's son and assistant deny that statements were made to the effect that witness Guido Barletta be harmed*—Harold Rivera denied making the alleged statement about Guido Barletta Blasini to the effect that if he were taken out of the picture, there would be no more case. He also denied intending to harm Barletta Blasini. He did admit that counsel Pesquera, in his father's presence did state that Barlettta was an old man in his 80s and that if he passed away there could be no more case. *See* testimony of Harold Rivera.

Ms. Martínez Nuñez likewise denied having heard any statement about Barletta Blasini being taken out of the picture. She did hear counsel Pesqu-

era state that if Barletta were to die of cancer and due to his age there would be no more case. *See* testimony to Rosa Martínez.

(5) *Defendant's son explained that Mr. Carlos Torres was contacted, but for a lawful purpose*—Harold Rivera in fact admitted he contacted (not personally) Mr. Carlos Torrres, the Government witness, on March 18, 2005, through counsel Prieto's efforts. Torres no longer worked for defendant, but had kept a company car. This vehicle was subsequently returned to Harold by FBI agents. Harold further stated he did not threaten Torres.

(6) *Defendant's Reputation and Character*—Attorney Prieto testified that he had known defendant since 1998. He had done civil legal work for him, and also became a close friend. He stated that despite his business, defendant had resided in Puerto Rico for the past 26 years. He had 6–7 children from different relations. He is open and candid about his extramarital relationship in the Dominican Republic, as well as about his religious practices.

Prieto also testified that on several occasions he had represented defendant in legal matters in which any person would become irritated or mad. Defendant never lost his cool, and acted more calmly than the average person. During the time he has known him, defendant has never suggested he would threaten anyone. Finally, upon question of the Court, he stated he would be willing to serve as a third party custodian and/or personally help post a bail bond.

### Analysis of the Evidence

At the outset, the Court finds the testimony of the Government agents to be entirely credible. Likewise, the Court also finds the testimony of Rosa Martínez Nuñez, Harold Rivera and attorney Mario Prieto to be trustworthy. Thus, the Court is left with conflicting testimony, particularly as to the issue of defendant's purported dangerousness. For purposes of detention this fact must be proven by clear and convincing evidence. *Mantecon–Zayas,* 949 F.2d at 551.

In the first instance, the Court does not doubt that FBI agents were informed by a confidential witness that defendant stated that he would "fuck" certain persons upon his return from Cuba, nor, that defendant's son stated that if Barletta were taken out of the picture there would be no more case. What is at issue here, however, is not the credibility of the special agents who have testified, but that of the confidential witness(es), who were not present at the detention hearing, hence not subject to cross-examination. It is not ultimately necessary that the Government call its confidential witnesses to testify at a detention hearing. *See United States v. Acevedo–Ramos,* 755 F.2d 203, 208 (1st Cir.1985) (holding that hearsay testimony is admissible at detention hearing). However, the (at times double) hearsay of the confidential witnesses provided to the Court is generic and perfunctory, quite conclusory, as well as unreliable to prove the particular circumstances surrounding the event referred to. For example, the confidential witness had reason to believe that the list of names from the computer was a "hit list". No further reasons, however, are provided to support this conclusion. Also, Harold Rivera and defendant allegedly made statements in the confidential witness' presence pertaining to witnesses and government personnel. Other than such statements themselves, the Government has not provided other details

about the same, which could provide an indicia of reliability of the hearsay. *See Acevedo–Ramos,* 755 F.2d at 208 (holding that hearsay testimony at detention hearing must be sufficiently reliable).

The 2002 information about the defendant having a hit man in Cubuy is equally unassailing. Other than such bare statement by a confidential informant to the FBI, the Court has no other facts upon which to determine the reliability of this allegation. More so, any possible violent acts dating back to 2002 must be connected to the offense at bar for purposes of witness or government personnel threat or intimidation as a ground for detention. *See United States v. Ploof,* 851 F.2d 7, 11–12 (1st Cir.1988).

The defendant's prior criminal record is also *per se* insufficient to maintain a finding of dangerousness. Other than the conviction itself, no other evidence nor facts surrounding the basis thereof was presented by the Government. To the contrary, from the testimony of Harold Rivera, it appears the case stemmed from a vehicular homicide.

Finally, the Court is unconvinced from the evidence presented, that Harold Rivera, the defendant's son intimidated a Government witness, more so, on his father's instructions. Harold has not been criminally charged. To the contrary, he testified the witness had failed to return the company car. Ultimately the FBI returned the same to Harold.

▇ In sum, the Government has not met in this case the elevated standard of proof required to detain a defendant on dangerousness grounds. Consequently, the Court must follow the Congressional mandate of the Bail Reform Act and order the defendant's release, unless he poses a flight risk. Upon a pondered analysis of the particular facts of this case, however, the Court concludes that no risk of flight is present. Even if so, conditions of release can be fashioned in this case to avoid the same, as well as guarantee the safety of witnesses and the community.

In this case, defendant's vast majority of family, economic and social ties are in this jurisdiction. He has traveled abroad countless times during the past years on business or religious matters and always returned. The Court finds it most significant that he has been aware of his current predicament for bank fraud for some time now. As the Government recognized at the hearing, he has been represented by counsel for some time and the Government had given him until March 30, 2005 to accept a plea offer of eighteen months. Although defendant intended to now travel again to the Dominican Republic on March 15, 2005 (and more likely than not, hop to Cuba), he had a return plane ticket. More so, his travel plans were not a secret and were known by his administrative assistant, who made the arrangements. In addition, although he faces a maximum sentence of thirty years if convicted, a term of probation is not a legal impossibility. The now advisory sentencing guidelines [1] provide an estimated sentencing range of 33–41 months imprisonment (BOL of 20) if defendant were held accountable for the total amount of the scheme to defraud ($2,403,100.00). Thus, realistically speaking, there is not a great incentive for defendant to flee this jurisdiction or abscond the country.

The Court has also considered the facts that defendant is engaged in an extramarital affair outside Puerto Rico, had two

---

1. The Court, at a glance, notes that defendant's conduct, as alleged in the indictment, took place from April to October 2000. The 1998 Guidelines Manual would thus apply (as none was promulgated for 1999).

expired drivers licenses in his possession, had two passports of which one was reported lost, and had two bogus resumes. These facts, however, are insufficient for the Court to determine by a preponderance of the evidence that defendant poses a flight risk. The Court notes defendant always traveled under his own identity. Further, the Government has presented no concrete evidence to the effect that defendant was fleeing the jurisdiction, or was taking affirmative steps to do so, or to transfer all his assets outside Puerto Rico and continental United States. Also, no evidence has been presented to the effect that defendant in fact has destroyed any evidence relative to this case.

In sum, the Court finds that in this case there exist conditions of release which can reasonably assure the defendant's appearance before this court. The Court notes that "reasonably assure" under the Bail Reform Act is not synonymous with "guarantee". *United States v. Tortora*, 922 F.2d 880, 884 (1st Cir.1990) (citing *United States v. Orta*, 760 F.2d 887, 891–892 (8th Cir.1985) (*en banc* )).

In light of the above, the court hereby **ORDERS** the defendant's pre-trial release under the following conditions [2]:

(i) A $100,000 bond secured by real property.

(ii) A $100,000 unsecured bond signed by attorney Mario Prieto

(iii) A second $100,000 unsecured bond signed by defendant's four sons who were present at the detention hearing.

(iv) Third party custodian approved by PTS

(v) Curfew to be set by PTS Z

(vi) Surrender of passports (presently in Court's custody)

(vii) No travel outside Puerto Rico, unless approved previously by the Court.

(viii) No foreign travel, unless approved previously by the Court

(ix) All other conditions of release set by the PTS office

The defendant shall be released upon the posting of the secured and unsecured bonds at issue. This order shall not be stayed by the undersigned if appealed.

**SO ORDERED.**

---

2. In setting these conditions, the Court is cognizant that the Bail Reform Act precludes "the *sub rosa* use of money bond" to detain a potentially dangerous defendant, but as to whom such fact has not been affirmatively proven under the clear and convincing evidence standard. *United States v. Mantecon Zayas*, 949 F.2d at 550.