**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Jose FERRER–SOSA [3], Defendant.**

**Criminal No. 08–216 (DRD).**

United States District Court,
D. Puerto Rico.

Signed June 24, 2014.

Maria Dominguez–Victoriano, Jose A. Ruiz–Santiago, United States Attorneys Office, San Juan, PR, for Plaintiff.

Ovidio E. Zayas–Perez, Zayas Perez Law Office, San Juan, PR, for Defendant.

## AMENDED OPINION AND ORDER

DANIEL R. DOMÍNGUEZ, District Judge.

On October 24, 2013, the court delivered a verbal opinion from the bench as to the bail reconsideration requested by co-defendant [3] Jose Ferrer–Sosa, pursuant to the challenge made as to a detention order pending trial determined by Hon. Magistrate Judge Bruce J. McGiverin (hereinafter "USMJ"), at Docket No. 15.[1] The district court found defendant a danger to the community. The court made specific findings of fact and conclusions of law from the bench. *See* Docket No. 176. The court indicated at the hearing that a formal opinion and order would eventually be entered by the Court. In view of co-defendant Ferrer–Sosa's request for severance (Docket No. 209) filed on May 6, 2014, and other motions recently filed, the court deems appropriate at this time, to enter its formal opinion and order.

### I. Background

1. Co-defendant Jose Ferrer (hereinafter referred to as "[3] Ferrer–Sosa") is charged in **Count 1** of the second superseding Indictment, with a conspiracy as to the use of an interstate facility in a Murder–For–Hire, under 18 U.S.C. § 1958(a), Docket No. 145. Defendant [3] Ferrer–Sosa is charged, together with co-defendant [1] Aurea Vazquez–Rijos (hereinafter "[1] Aurea Vazquez"), the wife of the victim, and her sister, co-defendant [4]

Marcia Vazquez–Rijos (hereinafter "[4] Marcia Vazquez").

All are charged with using interstate facilities, a car and phones, in the Murder–For–Hire of the then husband of [1] Aurea Vazquez, Adam Joel Anhang Uster (hereinafter "Anhang–Uster"). All three are charged as co-conspirators in the Murder–For–Hire of the victim, Anhang–Uster.

An un-indicted co-conspirator, Alex Pabón Colón (hereinafter referred to as "Pabón–Colón"), was the person hired to perform the murder, also referred to as the "hit man".

**Count 2** of the second superseding indictment constitutes the substantive charge under Title 18 U.S.C. § 1958(a), wherein only co-defendant [1] Aurea Vázquez is charged with using, an interstate facility, a 2005 white Porsche Cayenne, to drive Pabón–Colón and other co-conspirators to a meeting at Puerta de Tierra in San Juan, with the intent to commit a murder-for-hire by Pabón–Colón, that is, the murder of Anhang–Uster, in violation of the Laws of the Commonwealth of Puerto Rico and the United States, and in consideration for the receipt and promise and agreement to pay a sum of money, all in violation of 18 U.S.C. § 1958(a).

In **Count 3**, also a violation of 18 U.S.C. § 1958(a), only co-defendant [1] Aurea Vázquez is charged with a substantive violation under 18 U.S.C. § 1958 of using an interstate commerce facility, that is a telephone, to call Anhang–Uster with the intent to commit a murder by Pabón–Colón, also in violation of the Laws of the Commonwealth of Puerto Rico and of the United States, and in consideration for the

---

1. The Hon. U.S. Magistrate Judge determined that [3] Ferrer–Sosa constituted a danger to the community.

receipt and promise and agreement to pay a sum of money, all in violation of 18 U.S.C. § 1958(a).

**Count 4,** once again, only charges co-defendant [1] Aurea–Vázquez with a substantive violation of the use of an Interstate Facility, that is a BMW 5 series, and using said interstate facility to drive Anhang–Uster to Old San Juan with the intent to culminate the murder of her husband Anhang–Uster together with the hired hit man Pabon–Colon, who is not charged in any count, all in violation of the Laws of the Commonwealth of Puerto Rico and of the United States, and in consideration for the receipt and promise and agreement to pay a sum of money to the murderer, all in violation of 18 U.S.C. § 1958(a).

**Count 5** constitutes providing false statements to a Federal Grand Jury in the District of Puerto Rico, under Title 18 U.S.C. § 1623(a). This Count of the second superseding Indictment alleges that a Grand Jury was investigating the plot to hire a hitman to murder Anhang–Uster. Co-defendant [5] Charbel Vazquez–Rijos (hereinafter referred to as "[5] Charbel Vazquez", was asked by the Grand Jury on July 22, 2013, whether he knew Pablin–Collin. [5] Charbel Vazquez provided material false testimony as to knowing Pablin–Collin, and also, as to discussing with Pablin–Collin, together with other family members of [1] Aurea Vazquez, the *"taking care of Anhang–Uster,"* or killing Anhang–Uster, all in violation of 18 U.S.C. § 1623(a).

On July 5, 2013, the USMJ denied the bail as explained above. The USMJ found that codefendant [3] Ferrer–Sosa constituted a danger to the community. The USMJ found that the nature of the offense, a Murder–For–Hire, was serious, as it carried a life sentence under 18 U.S.C. § 1958(a), and, in the instant case, the

murder for hire was indeed carried out. The USMJ also found additional reasons for the detention, such as, the use of controlled substances, and the mental history of co-defendant [3] Ferrer–Sosa, amongst others. *See* Docket No. 15 at p. 2.

The district court is of the opinion that because the instant offense carries a maximum life sentence of imprisonment, as provided by 18 U.S.C. § 3142(f)(1)(B), when a murder is charged, a rebuttable presumption of detention is established under 18 U.S.C. § 3142(f)(1)(B). The rebuttable presumption causes the defendant to rebut: "that no condition or combination of conditions will reasonably assure [both] the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3).

Therefore, in the opinion of this court, co-defendant [3] Ferrer–Sosa constitutes initially, subject to rebuttal, both a risk of flight to prosecution, and a risk of danger to the community. *United States v. Jessup,* 757 F.2d 378, 384 (1st Cir.1985), partially abrogated on other non-related grounds by *United States v. O'Brien,* 895 F.2d 810, 814 (1st Cir.1990) (abrogating *Jessup,* exclusively as to the standard of appellate review).

On September 27, 2013, more than sixty (60) days after the denial of the USMJ's determination, co-defendant [3] Ferrer–Sosa filed a *De Novo* Bail Review hearing request, without alleging any new facts. Docket No. 165. Defendant alleges, among other factors, that he is a first time offender, lives with his mother, has never been outside of Puerto Rico, has a steady job, but was recently laid off for economic reasons. He also alleges that for a period of four (4) years he was being investigated and did not leave the Island, and that he has excellent ties to the jurisdiction. Further, his family offered a bail of One Hundred Thousand dollars ($100,000.00.).

The court understands that defendant has failed to rebut the presumption. The court explains:

Defendant [3] Ferrer–Sosa alleges that he is not a danger to the community, *citing United States v. Domínguez,* 783 F.2d 702 (7th Cir.1986), but the court finds that the cited case only applies to a statutory minimum sentence of ten (10) years or more but does not involve a murder.

Further the instant case warrants a sentence that may run from as low as twenty (20) years (a potential lesser included offense) to a maximum of a life sentence, due to the seriousness of the conduct reflecting danger to the community by conspiring to commit a murder. Defendant also alleges that he is not a flight risk because he has never left the Island and is not a danger to the community, notwithstanding he is charged with a conspiracy to commit a murder-for-hire subject to a life sentence.

The United States strongly disagrees as to the granting of bail to the defendant [3] Ferrer–Sosa. Docket No. 170. The United States vehemently alleges that defendant [3] Ferrer–Sosa has not produced any evidence to warrant a *de novo* review, nor has defendant [3] Ferrer–Sosa overridden the presumption of detention. The United States, on the other hand, produced an Affidavit of an agent, as an integral part of its Opposition, at Docket 170, describing in coherent daily detail the participation of co-defendant [3] Ferrer–Sosa in the conspiracy as to the hiring of the hit man Pabón–Colón, together with co-defendants [1] Aurea Vázquez and [4] Marcia Vázquez, wherein the ultimate goal was to kill Anhang–Uster.

The court explains:

1. Co-defendant [1] Aurea Vazquez owned a Bar/Restaurant called The Pink Skirt in Old San Juan. The Bar/Restaurant was operated by [4] Marcia Vázquez ([1] Aurea Vazquez' sister), and her boyfriend, defendant [3] Ferrer–Sosa. They agreed to hire Pabón–Colón, a narcotics supplier to [3] Ferrer–Sosa and a friend of [4] Marcia Vazquez, to execute the murder-for-hire job. Defendant [3] Ferrer–Sosa and [4] Marcia Vazquez discussed with Pabon–Colon about [1] Aurea Vazquez' problems with her husband Anhang–Uster, as the husband allegedly mistreated her. (Affidavit, Docket 170–1, ¶ 3). [1] Aurea Vazquez had previously entered into a formal pre-nuptial agreement wherein she would receive money even if Anhang–Uster died, rather than lived. Docket No. 145 page 4. [1] Aurea Vazquez was to receive money depending on her years of marriage and/or if there was no divorce during certain number of years after marriage. See, U.S. District Court for the District of Puerto Rico, Civil Case No. 06–1833(DRD), Docket No. 22, wherein plaintiff Aurea Vazquez valued her pre-nuptial agreement at over twelve million dollars ($12,000,000) (one half of Anhang–Uster's property to be donated to her) at the maximum, and at the least a $3,500.00 monthly alimony for life if the couple remained married for a short period of time. Said alimony amount increased as her marriage years continued. (See also Deed of Prenuptial Agreement, Exhibit 1 to Docket No. 22 in Civ. 06–1833(DRD).[2]

2. Two weeks prior to the murder, defendant [3] Ferrer–Sosa told Pabon–Colon *to take care of that problem,* referring to the problem between [1] Aurea Vazquez and her husband, Anhang–Uster, who allegedly was mistreating [1] Aurea

---

**2.** The Court takes judicial notice of the allegations filed by defendant Aurea Vázquez on her own behalf in Civil No. 06–1833(DRD).

Vazquez, obviously a pretext by [1] Aurea Vazquez to murder Anhang–Uster after discovering Anhang–Uster's intent to divorce her. Thereafter, [3] Ferrer–Sosa and [4] Marcia Vazquez met several times to plan the murder. The original plan was to be executed using interstate facilities, phones, celullar phones and two automobiles.[3] Affidavit, Docket 170–1, ¶ 4). On September 21, 2005, defendant [1] Aurea Vazquez again met with Pabon–Colon, [4] Marcia Vazquez and [3] Ferrer–Sosa. Pabon–Colon originally thought that his participation was merely to provide a beating to Anhang–Uster.

Thereafter, the four actors, Aurea, Marcia, Ferrer–Sosa y Pabon–Colon, proceeded in the SUV Porsche Cayenne to a restaurant at Puerta de Tierra in San Juan, known as "The Hamburger". There, codefendants [3] Ferrer–Sosa and [1] Aurea Vazquez then spoke specifically about murdering Anhang–Uster to by Pabon–Colon. A weapon was needed for Pabon–Colon at the suggestion of [3] Ferrer–Sosa, and the murder had to be urgently performed prior to Anhang–Uster's filing for a divorce. Pabon–Colon initially refused, but [3] Ferrer–Sosa suggested to [1] Aurea Vazquez to offer Pabon–Colon the sum of Three Million Dollars ($3,000,000) to kill Anhang–Uster. A check was offered to buy a weapon to Pabon–Colon by [1] Aurea Vazquez, [3] Ferrer–Sosa and [4] Marcia Vazquez, but Pabon–Colon refused the check, as the check could be traced by the Police. Docket 170–1, ¶ 5. "Pabon–Colon asked for cash, and then said that he would solve the matter". Affidavit at Docket 170–1, ¶ 5.

On September 22, 2005, a plan was developed by [1] Aurea Vazquez and Pabon–Colon, wherein [1] Aurea Vazquez would park her BMW at "La Cochera" parking lot in Old San Juan, and Pabon–Colon

would *do what he needed to do.* Affidavit, Docket 170–1, ¶ 6.

During the afternoon of September 22, 2005, co-defendant [1] Aurea Vazquez called Anhang–Uster over the phone on numerous occasions at his mobile and office phones and convinced him to have dinner at a restaurant in Old San Juan to reach an agreement as to their divorce. *Id.* ¶ 7. Pabon–Colon received a call from co-defendant [3] Ferrer–Sosa around 9:00 p.m., informing that Anhang–Uster had to be murdered that same night as he was planning to file divorce papers the next day, causing the Pre–Nuptial Agreement favoring [1] Aurea Vazquez, to become ineffective if the divorce was filed. Docket 170–1, ¶ 7. Co-defendant [3] Ferrer–Sosa contacted Pabon–Colon and advised that [1] Aurea Vazquez and Anhang–Uster were having dinner at a restaurant called Dragon Fly in Old San Juan. [3] Ferrer–Sosa afterwards also informed Pabon–Colon they were heading to "La Cochera" parking garage where the BMW would be parked, as the conspirators had planned. *Id.* ¶ 7.

Because of the short notice, Pabon–Colon was unable to secure a firearm as initially requested. Docket 170–1, ¶ 8. Pabon–Colon then stole a large kitchen knife with a black handle and a pair of plastic gloves from a nearby restaurant, Café Guarionex, Docket 170–1, ¶ 8. Pabon–Colon waited on the street and stood by the door at Café Guarionex until he saw [1] Aurea Vazquez and Anhang–Uster pass by him, shortly after midnight. Two eyewitnesses confirmed seeing Pabon–Colon following the couple who were at a short distance; one of the eyewitnesses knew Pabon–Colon from the neighborhood and saw his face while Pabon–Colon was following [1] Aurea Vazquez and Anhang–

---

**3.** The two interstate facility cars were a BMW 5 series and an SUV Porsche Cayenne.

Uster. Pabon–Colon saw that [1] Aurea Vazquez and Anhang–Uster appeared to be arguing while they walked up the street towards the entrance to the parking building "La Cochera". Docket No. 170–1, ¶ 9.

Pabon–Colon, eventually used a knife and stabbed Anhang–Uster several times at the corner of San Justo and Luna Streets, which was a dark place as some of the street lights were inoperable, and where [1] Aurea Vazquez had led her husband. Docket 170–1, ¶ 10. Pabon–Colon put down the knife after stabbing the victim and picked up a cobblestone, hitting lightly [1] Aurea Vazquez to camouflage that [1] Aurea Vazquez was not involved in the murder. While the fight was taking place, Anhang–Uster shouted to Aurea: "*run baby, run*". Docket 170–1, ¶ 12.

Pabon–Colon then hit [1] Aurea–Vazquez in the head with the cobblestone and she fell to the ground. Pabon–Colon, in prior conversations with [1] Aurea Vazquez, had agreed, according to the instructions he received from her, to assault her in order to make the incident look real as to [1] Aurea Vazquez being a victim of the assault. Docket 170–1, ¶ 12. After hitting [1] Aurea Vazquez, Pabon–Colon hit repeatedly the victim, Anhang–Uster in the head with a cobblestone. Docket 170–1, ¶ 12. Anhang–Uster died as a result of the severe injuries caused by the rock hits to his head and body and the knife injuries all caused by Pabon–Colon.

In a subsequent interview with the FBI, defendant [3] Ferrer–Sosa voluntarily informed that he knew Pabon–Colon and had previously purchased illegal drugs from him. [3] Ferrer–Sosa informed that he may have been in Old San Juan on the night of September 22nd, but only to purchase illegal narcotics. Docket 170–1, ¶ 14.

## II. Bail Review under the Bail Reform Act.

Notwithstanding the court having serious doubts that the instant bail appeal is barred by either untimeliness as to the filing of the instant bail review request, or by lack of showing of any recent new legal issue or new unknown fact, the court will entertain the matter *de novo* on the merits.

Hence, as the USMJ's detention order is partially contested, the court considers the matter *de novo* as to the contested matters only, under the guidelines set forth by the Bail Reform Act at 18 U.S.C. § 3142. *United States v. Tortora*, 922 F.2d 880, 883 n. 4 (1st Cir.1990); *see also*, *United States v. Torres–Rosario*, 600 F.Supp.2d 327, 330 (D.P.R.2009). The Court proceeds accordingly.

Under the Bail Reform Act, the court is directed to impose detention without bail in circumstances where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). The Bail Reform Act sets forth four factors which the court must weigh in determining whether pretrial detention is warranted. *See* *Torres–Rosario*, 600 F.Supp.2d at 330.

The four factors are: "(1) the nature and circumstances of the offense charged; (2) the weight of the evidence as to guilt or innocence; (3) the history and characteristics of the accused, including past conduct; and (4) the nature and gravity of the danger posed by the person's release." *United States v. Tortora*, 922 F.2d 880, 884 (1st Cir.1990) (citing the factors outlined at 18 U.S.C. § 3142(g)(1)-(4)); *see also*, *United States v. Gines Perez*, 152 F.Supp.2d 137, 148 n. 13 (D.P.R.2001). At the *de novo* bail hearing, both parties may proceed via proffer, *United States v. Acevedo–Ramos*,

755 F.2d 203, 208 (1st Cir.1985) (the court of appeals *citing* The House Judiciary Committee, HR No. 987, 91 Congress 2nd Session 182, 184 (1979)).

However, under the Bail Reform Act, where a criminal defendant is charged with certain serious crimes, including those with which defendant [3] Ferrer–Sosa is charged in the instant case; [4] a presumption arises "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3); *see also Gines Perez,* 152 F.Supp.2d at 147. The presumption, therefore, is that the criminal defendant poses both a risk of flight prior to prosecution and a risk of danger to the community. *United States v. Jessup,* 757 F.2d at 384.

■■■ Once triggered, the defendant may rebut the presumption, however, by producing "conflicting evidence" as to the risks of danger and flight. *Id.* (outlining what is known as the "intermediate position"). Not all evidence is sufficient to overcome the presumption; [5] the court must weigh any evidence produced by the defendant against the presumption, and the evidence produced by the government in order to determine whether detention without bail is appropriate. *Gines Perez,* 152 F.Supp.2d at 147 (*citing Jessup,* 757 F.2d at 384); *see also United States v.*

*Villanueva–Rodriguez,* 190 F.Supp.2d 257, 259 (D.P.R.2002). Thus, while the burden of persuasion always rests with the United States, the burden of production shifts to the criminal defendant once the rebuttable presumption of flight and danger to the community is activated. *See Jessup,* 757 F.2d at 384.[6] The court proceeds to examine the required criteria in *seriatim* fashion.

### (A) The Nature and Circumstances of the Offense.

■■ The court notes that the offense with which defendant [3] Ferrer–Sosa is charged is serious, as he is charged with a Murder–For–Hire. *See Torres–Rosario,* 600 F.Supp.2d at 331–332 (noting that an offense that triggers the presumption of detention supports a finding that the offense is serious for the purposes of application of the first factor, the nature and circumstances of the offense involved).

### (B) The Weight of the Evidence.

The second superseding indictment (Docket 145) particularly the Overt Acts 1, 2, 3, 8 and 9, as well as the Affidavit of the agent at Docket No. 170–1, show that the evidence weights heavily against defendant [3] Ferrer–Sosa, as the government has shown that he knew the hit man Pabon–Colon, who will testify against [3] Ferrer–Sosa. [3] Ferrer–Sosa in fact selected Pa-

---

**4.** It remains undisputed that the provision of the Bail Reform Act implicates the rebuttable presumption of dangerousness. The instant case constitutes a crime of violence mandating a life sentence or a twenty (20) year term under a potential lesser included offense, all under Murder–For–Hire conspiracy using interstate facilities (cars) and/or phones or cell phones, all under 18 U.S.C. § 1958(a).

**5.** The defendant is thus required to produce some conflicting evidence to undercut the presumption of dangerousness under *Jessup, supra.* *O'Brien,* 895 F.2d at 815.

**6.** However, the court also recognizes that certain other courts have stated that the factor of the weight of the evidence is the least weighty of the four criteria and, accordingly, acting out of an abundance of caution, has afforded it less weight than the other factors. *See United States v. Rodriguez–Adorno,* 606 F.Supp.2d 232, 240 n. 11 (D.P.R.2009) (*citing United States v. Chen,* 820 F.Supp. 1205, 1207 (N.D.Cal.1992)).

bon–Colon as the hit man, who was one of Ferrer's drug providers. [3] Ferrer–Sosa also suggested the use of a weapon. [3] Ferrer–Sosa informed Pabon–Colon of the urgency of killing the victim prior to the filing of divorce papers and advised Pabon–Colon of the meeting place (restaurant in Old San Juan) where [1] Aurea Vazquez and Anhang–Uster were to meet to discuss their divorce issues, all enabling and designed for Pabon–Colon to locate, follow, and kill Anhang–Uster that same night. Further, [3] Ferrer–Sosa was present at other meetings, as he was at the meeting when [3] Ferrer–Sosa suggested [1] Aurea Vazquez to pay Pabon–Colon the sum of three million dollars ($3,000,000) to kill Anhang–Uster. Hence, [3] Ferrer–Sosa is not in the periphery of the conspiracy; to the contrary, [3] Ferrer–Sosa is an active actor selecting the murderer, suggesting payment, suggesting the use of a weapon, and pronouncing instructions to the murderer to execute the crime.

### (C) The History and Characteristics of the Defendant Ferrer–Sosa.

When analyzing the third factor, relating to the history and characteristics of the defendant, the court is directed to examine defendant's criminal history, employment, health, residence and family ties in order to determine whether he is likely to flee. However this evidence also speaks as to the dangerousness of the defendant as well. *Id.* This factor presents a serious problem for the defendant [3] Ferrer–Sosa.

Although the instant crime is apparently [3] Ferrer–Sosa's first offense, this offense constitutes a serious crime. [3] Ferrer–Sosa is also addicted to drugs as accepted by him in a Statement made to the FBI as narrated above. Ferrer–Sosa is thus, by his addiction, a frequent visitor to drug points or receiver of drugs via transac-

tions. Defendant Ferrer–Sosa tested positive to marihuana and he has a mental health history. Further as to [3] Ferrer–Sosa's personal characteristics, he participated actively in the conspiracy, as expressed in the overt acts as described in Count 1. He showed proclivity to violence by hiring the hit man that was known to him, and providing guidance to the hit man to accomplish the crime. [3] Ferrer–Sosa not only selected the hit man, but also later advised him the place where the victim was dining with his wife, enabling the hit man to follow the victim leading to the murder.

Defendant [3] Ferrer–Sosa also represents a risk of flight. First, the defendant has nothing to lose by fleeing the jurisdiction, as he is facing a mandatory life sentence, or a sentence of up to twenty (20) years, if the jury finds Ferrer–Sosa guilty of a lesser included offense. Further, defendant [3] Ferrer–Sosa had an on-and-off continuous relationship with [4] Marcia Vazquez, who is a co-defendant and the sister of [1] Aurea Vazquez, the principal defendant who fled to Italy to avoid prosecution.

The United States proffered that [4] Marcia Vazquez visited [1] Aurea Vazquez in Italy several times. Hence, co-defendant [4] Marcia Vazquez has the financial capacity to aid his boyfriend [3] Ferrer–Sosa, in fleeing, notwithstanding that he has no passport. Further, the presumption of flight is within the purview of this case, due to the crime of violence involving a life sentence.

### (D). Danger to the Community.

Nevertheless, the crux of the matter and the deciding element before the court does not pertain to these factors. It is pellucid that, if defendant [3] Ferrer–Sosa is released, he presents a danger to the community. First, defendant [3] Ferrer–Sosa

suggested Pabon–Colon as the hit man to do the job, a friend or acquaintance who provided drugs to him. Further, [3] Ferrer–Sosa met several times with [1] Aurea Vazquez and [4] Marcia Vazquez, together with Pabon–Colon to plan and carry on the murder of Anhang–Uster, the husband of [1] Aurea Vazquez enabling her to be the recipient of a large amount of money.

Finally, [3] Ferrer–Sosa informed Pabon–Colon that [1] Aurea Vazquez and Anhang–Uster were dining at the Dragon Fly restaurant on the night of the murder and hence, provided the hit man Pabon–Colon with the place where the victim could be followed, to be later murdered. Further, [3] Ferrer–Sosa also advised the hit man that they were heading to "La Cochera" parking lot, also in Old San Juan, where [1] Aurea Vazquez' car (BMW) was parked. Hence, co-defendant [3] Ferrer–Sosa showed by his participation in the crime, as expressed in the overt acts of the conspiracy, Docket 145, Overt Acts No. 1, 2, 3, 8, and 9, the proffers by the United States and the Sworn Statement by the agent at Docket 170–1, that defendant [3] Ferrer–Sosa had a critical and important participation in the case, which clearly demonstrated his tendency to violence if released, meaning a danger to the community. Since [3] Ferrer–Sosa was not a mere peripheral actor in the conspiracy, but to the contrary, a critical important asset in the conspiracy, [3] Ferrer–Sosa,

undoubtedly, constitutes a danger to the community if granted release.

In his pending request for release of bail, [3] Ferrer–Sosa does not present the court with any evidentiary proffers to show that the presumption of dangerousness has been surpassed. Rather, the facts as proffered, and/or included in the Affidavit of the government Agent, Docket 170–1, and by the overt acts charged in Count 1 of the second superseding Indictment show the contrary. (See overt acts at the manner and means of the conspiracy at Docket No. 145, pp. 7 and 8, ¶¶ 1, 2, 3, 8, and 9).

### Conclusion

The risk of danger to the community as to codefendant [3] Ferrer–Sosa is clearly supported by his own conduct demonstrating violence by critically aiding in the Murder–For–Hire of Anhang–Uster. The court understands that the standard of "clear and convincing evidence" as to danger to the community, as required under *United States v. Salerno*, 481 U.S. 739, 750, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) has been clearly satisfied.

The court therefore, understands that the defendant [3] Ferrer–Sosa also poses a flight risk by preponderance of the evidence under *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir.1991).[7]

Therefore, the evidence presented by the defendant [3] Ferrer–Sosa has not

---

7. The long potential sentence, (mandatory life), or over twenty (20) years, constitutes a high risk of flight; especially considering the strong case on the merits presented by the United States in the instant case, as supported by overt acts stated in Count 1 as to defendant [3] Ferrer–Sosa's participation. The Affidavit accompanying the opposition filed by the United States (Docket 170, 170–1), and the proffers made by the United States at the bail review hearing, all support defendant [3] Ferrer–Sosa's risk of flight. All the evidence is further corroborated by the cooperator, the hit man Pabon–Colon, and by other independent evidence such as eyewitnesses who recognized the defendant following [1] Aurea Vazquez and Anhang–Uster immediately before he was murdered, as expressed in the Affidavit at Docket No. 170–1, as well as potential toll phone records evidence, and proffers, all pertinent pursuant to *United States v. Castiello*, 878 F.2d 554 (1st Cir.1989) (long sentences together with strong inculpating evidence easily lead to a flight risk conclusion).

overridden the rebuttable presumption of risk of flight and dangerousness to the community relating to a potential life sentence as indicated in 18 U.S.C. § 3142(f)(1)(B).

The Order of detention entered by USMJ Hon. Bruce J. McGiverin on July 11, 2013, at Docket No. 15, is hereby AFFIRMED. Defendant [3] Ferrer–Sosa is to remain DETAINED.

IT IS SO ORDERED.